**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: scott@bursor.com
          ltfisher@bursor.com
          apersinger@bursor.com

*Interim Class Counsel*
*(Additional Counsel on Signature Page)*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE CONDE, et al., | Case No. 14-CV-51 JLS (WVG) |
| Plaintiffs, | **THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| SENSA, et al., | Honorable Janis L. Sammartino |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Susan Grace Stokes by her undersigned attorneys, bring this class action complaint against Sensa Products, LLC; Sensa, Inc. (f/k/a Intelligent Beauty, Inc.); IB Holding, LLC (a/k/a Intelligent Beauty Holding, LLC); TechStyle, Inc. (f/k/a JustFab, Inc. and Just Fabulous, Inc.); Dr. Alan R. Hirsch; Don Ressler; Adam Goldenberg; Kristen Chadwick; TCV VI, L.P; TCV Technology Crossover Ventures; John Drew; and Does 1 through 10 (collectively, "Defendants").  Plaintiff's allegations are based upon personal knowledge as to her own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      In this class action lawsuit, Plaintiff alleges that the marketing of the Sensa Weight Loss System ("Sensa") was false and misleading.  The company that manufactured, marketed and sold Sensa has gone out of business after the Federal Trade Commission entered a judgment against them for fraudulently marketing the product.  In addition, in a lawsuit against Dr. Alan Hirsch, the inventor of Sensa, the company admitted that the claims made about the product were false.

2.      Sensa was marketed as "an easy, effective way to lose weight" that was "doctor formulated" and "clinically shown to help you lose up to 30lbs or more in just 6 months."  Sensa consists of shakers of magic "tastant crystals," also described as "sprinkles," which users were instructed to sprinkle on their food.  The "Sensa 6-Month System" included two shakers of tastants for each month starting with "Month 1" and continuing through "Month 6."  According to the sales pitch, users could lose 30+ pounds without a change in "exercise routine" or "lifestyle," and without "food restrictions," simply by sprinkling Sensa crystals on their food to "take the weight off."  Sensa's website explained "How It Works" with the following image:



*See* Sensa Website, www.sensa.com (last visited Jan 14, 2014).

3.    According to Defendants, "[as] you eat, smell and taste receptors send messages that tell your body it's time to stop eating.  This is a phenomenon we call Sensory Specific Satiety.  By enhancing smell, SENSA® Testants were designed to help speed up the process and trigger your 'I feel full' signal, so you eat less and feel more satisfied."  As a result, you supposedly eat less and lose weight.[1]

4.    The Sensa website and Sensa YouTube channel provided an instructional video on "How Sensa Works."[2]  The video asks, "So, how do you use Sensa?"  The video explains, "Simply sprinkle Sensa on your food to take the weight off."  The following images, obtained from the video on the Sensa website, illustrate how Sensa purported to help you lose weight "without dieting."  The video explains that "as you eat, Sensa works with your sense of smell and taste to help stimulate your body's natural hunger control switch."  When Sensa activates the "hunger control switch" the meter in the user's brain switches from empty to full.

---

[1] Sensa Website, http://www.sensa.com/?action=works.main (last visited Jan. 16, 2014).

[2] *See* Sensa Website, http://www.sensa.com/?action=works.main (last visited Jan. 15, 2014); *see also* SENSA, YouTube.com, http://www.youtube.com/watch?v=-ebppfjqHaQ (last visited Jan. 15, 2014).



5.      The instructional video explains that Sensa activates "your body's natural hunger control switch" so Sensa users can "Lose 30lbs in just 6 months without dieting.  You simply sprinkle Sensa on your food."  Indeed, the onscreen graphic clearly illustrates "studies show avg. weight loss of 30lbs in 6 months."

**STUDIES SHOW AVG. WEIGHT LOSS OF 30 LBS IN 6 MONTHS.**

6. To bestow Sensa with an aura of legitimacy, the statement "DOCTOR FORMULATED" appeared in all caps under the name "Alan Hirsch M.D" on the labels of Sensa products. The packaging also stated "Shake. Eat. Lose." with "No Pills, No Diuretics, No Calorie Counting."

7. The marketing of Sensa was false and misleading because Sensa crystals are ineffective. Sensa has not been "clinically shown" to cause weight loss. Sensa crystals do not induce a "phenomenon" called "Sensory Specific Satiety." Further, the Sensa Weight Loss System is not "supported by impressive clinical results" because those supposed results are based on fabricated clinical trials.

8. Plaintiff relied on Defendants' false and misleading sales pitch for Sensa crystals, and she would not have purchased Sensa crystals had she known the product is ineffective. She brings this class action on behalf of herself and other purchasers of Sensa crystals and assert claims against Defendants for violations of the Magnuson-Moss Warranty Act, California's Consumers Legal Remedies Act, California's False Advertising Law, the unlawful, unfair and fraudulent prongs of California's Unfair Competition Law, Florida's Unfair Trade Practices and Consumer Protection Act, for breach of implied and express warranties, and for negligent misrepresentation.

**BACKGROUND**

9.     According to a September 2002 Federal Trade Commission Staff Report,[3] the number of Americans who are overweight or obese have reached epidemic proportions; it afflicts 6 out of every 10 Americans.  At the same time, nearly 29% of men and 44% of women are trying to lose weight (an estimated 68 million American adults).  Thus, the potential market for sellers of weight-loss products and services is huge.  Consumers spent an estimated $34.7 billion in 2000 on weight-loss products and programs.  The marketplace has responded with a proliferation of products and services, and many promise miraculous, quick-fix remedies.  The FTC found that "[t]he use of false or misleading claims in weight-loss advertising is rampant."[4]

10.     Into this lucrative market stepped a particularly sophisticated huckster – one with a medical degree and a thick stack of junk science to support the claim that his magic crystals are "clinically shown" to promote weight loss without dieting.  Dr. Alan Hirsch, M.D., is a board-certified neurologist.  His name and photograph appear on Sensa's packaging, website, advertisements, and promotional literature, together with claims that he has conducted and published more than 200 research studies, authored 8 books, and appeared on numerous television programs including Dateline NBC, CNN, the CBS Early Show, Good Morning America, and Extra.  Dr. Hirsch's 20-plus years of research regarding the impact of smell and taste on weight loss purportedly culminated in the patent-pending technology used in the SENSA® Weight-Loss System.  In fact, neither Dr. Hirsch nor any other medical professional has ever "clinically shown" that Sensa crystals effectively promote weight loss.

---

[3]  Richard L. Cleland, *et al.*, "Weight Loss Advertising: An Analysis of Current Trends, A Federal Trade Commission Staff Report," September 2002 (hereafter, "FTC Staff Report"), *available at* www.ftc.gov/reports/weight-loss-advertisingan-analysis-current-trends/ (last visited Jan. 15, 2014).

[4]  *Id.*, Executive Summary, at page x.

11.     Prior to 1994, weight-control products were regulated as drugs.  Unless they were either generally recognized as safe and effective or an approved new drug, over-the-counter ("OTC") products labeled for weight control were misbranded under Section 502 of the Food, Drug, and Cosmetic Act.  *See* FTC Staff Report at 27-28.  With some limited exceptions not pertinent here, an OTC product labeled for weight control required some form of pre-market review and approval by the Food and Drug Administration ("FDA") to determine safety and effectiveness.  *Id.* at 28.  "In 1994, the passage of the Dietary Supplement Health and Education Act of 1994 (DSHEA) dramatically changed the regulatory framework for weight-loss supplements, shifting FDA's role from premarket clearance to post-market enforcement and shifting the responsibility from government to industry to ensure products were safe and effective."  *Id.*

12.     According to the FTC, "this change in regulatory structure has coincided with a dramatic increase in the number of dietary supplement weight-loss products as well as the amount of weight-loss product advertising."  *Id.*  Dr. Hirsch took advantage of this change in the regulatory structure to market Sensa crystals to millions of consumers who would be unable to decipher and debunk the junk science behind the product.  In fact, his skillful and crooked manipulation of the regulatory shift resulted in Sensa sales totaling nearly $364 million from 2008-2012.

13.     While the FTC relaxed the criteria to place weight loss products on the market, the FTC will still prosecute the worst offenders.  On January 7, 2014 the FTC brought suit against Defendants for unfair or deceptive practices and false advertisement in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§45(a) and 52.  As a result, the FTC and several Defendants entered into a stipulated judgment for $46.5 million.  The judgment also enjoined several Defendants from making misleading claims that Sensa causes or helps weight loss.

# THE PARTIES

**Defendants**

14.     Defendant **Sensa Products, LLC ("Sensa Products")** is organized under the laws of Delaware and registered with the California Secretary of State to conduct business in California.  Sensa Products' principal place of business was 2301 Rosecrans Ave. Ste. 4100, El Segundo California, 90245.  However, on October 6, 2014, the entity was assigned for the benefit of creditors.

15.     Defendant **Sensa, Inc. (f/k/a Intelligent Beauty, Inc.) ("IBI")** is a Delaware corporation registered with the California Secretary of State to conduct its business in California.  IBI's principal place of business was 2301 Rosecrans Ave Ste. 1150, El Segundo California, 90245.  IBI had an ownership interest of 90% in Sensa Products, LLC (collectively the "Sensa Entities").

16.     Defendant **TechStyle, Inc. (f/k/a JustFab, Inc. and Just Fabulous, Inc.)("JustFab")** is a Delaware corporation registered with the California Secretary of State to conduct its business in California.  JustFab's principal place of business is 800 Apollo St. El Segundo California, 90245.  Formerly, JustFab's principal place of business was 2301 Rosecrans Ave, El Segundo, California.

17.     Defendant **IB Holding, LLC (a/k/a Intelligent Beauty Holding, LLC) ("IB Holding")** is organized under the laws of Delaware and registered with the California Secretary of State to conduct business in California.  IB Holding's principal place of business is also 800 Apollo St., El Segundo California, 90245.  Formerly, IB Holding's principal place of business was also 2301 Rosecrans Ave, El Segundo, California.  IB Holding is a holding company with ownership interest in JustFab.  IB Holding was also an owner of the Sensa Entities.  Defendant Goldenberg concedes that JustFab and the Sensa Entities were operated as a single entity until at least 2010.  Even after the purported separation of these entities, money continued to move freely between them.

18.     Defendant **Alan R. Hirsch** is a citizen of Illinois who created Sensa after he purportedly did 25 years of research on "tastants."  Dr. Hirsch's name appears on Sensa packaging under the words "Dr. Formulated," and his research is touted on the Sensa websites.  Dr. Hirsch was a 10% owner of Sensa Products.  Dr. Hirsch received almost $11 million in advancements and distributions from Sensa Products.  Much of this money was received after the Sensa Entities' insolvency became apparent.

19.     Defendant **Don Ressler**, Executive Chairman of Sensa Products, oversaw all operational aspects of the company, including marketing and sales.  He is an owner, board member and officer of JustFab and IB Holding.  He was an owner, board member and officer of the Sensa Entities.  He co-founded all of these companies with Adam Goldenberg in in El Segundo, California.  Under the terms of incorporation of Defendant Sensa Products, he also served as a manager, to whom all officers reported.  As a manager, he had full power to enter into contract, fulfill the obligations and responsibilities under all agreements entered into by the company, actively monitor and supervise projects and manage the business of the company, pay the operating expenses of the company, pay all taxes, maintain day-to-day books and records for the company, and provide any necessary day-to-day management of the company.  At times Defendant Ressler simultaneously held officer and board positions with the Sensa Entities, JustFab, and IB Holding.

20.     Defendant **Adam Goldenberg** cofounded the Sensa Entities, IB Holding and JustFab with Don Ressler.  He is a shareholder, board member and officer of JustFab and IB Holding.  He was a shareholder, board member and officer of the Sensa Entities.  Under the terms of incorporation of Defendant Sensa Products, he also served as a manager, to whom all officers reported.  As a manager, he had full power to enter into contract, fulfill the obligations and responsibilities under all agreements entered into by the company, actively monitor and supervise projects and manage the business of the company, pay the operating expenses of the company, pay

1   all taxes, maintain day-to-day books and records for the company, and provide any

2   necessary day-to-day management of the company.  At times, Defendant Goldenberg

3   simultaneously served as the CEO of IBI, IB Holding, and JustFab.

4       21.    Defendant **Kristen Chadwick** was the President of Sensa Products

5   and/or IBI.  She assumed responsibility for Defendant Ressler's day-to-day

6   management responsibilities.  Defendant Chadwick wore several hats during her six

7   year involvement with the company.  From 2007-2008, she acted as a Brand Director

8   at IBI, and she was involved with the 2009 launch of Sensa which eventually

9   bourgeoned into its own company.  Interestingly, she received an award from GNC

10  (for the company) as "GNC Vendor of the Year 2012."  She was also IBI's Employee

11  of the Year in 2010 for her involvement in building the Sensa brand.  On January 7,

12  2014 after the FTC fined the Sensa Entities and ordered the company to return $26.5

13  million to consumers, she issued a statement saying "We stand behind Sensa. We

14  continue to receive positive feedback from our customers and remain committed to

15  developing products that help our No.1 priority – our customers – live healthier,

16  happier lives." http://articles.latimes.com/2014/jan/07/business/la-fi-ftc-sensa-

17  20140108.  In fact, Defendant Chadwick felt so strongly about standing "behind

18  Sensa" that she directed board members of the Sensa Entities to hide the financial

19  insolvency of the Sensa Entities from creditors.  Furthermore, Defendant Chadwick

20  played an integral role in moving money across the Defendant entities.

21      22.    Defendant **TCV VI, L.P. ("TCV")** is a limited partnership organized

22  and existing under the laws of the State of Delaware.  Its principal office is located at

23  528 Ramona Street, Palo Alto, California.  TCV is an owner, directly or indirectly, of

24  JustFab and IB Holding.  TCV was an owner, directly or indirectly, of the Sensa

25  Entities.

26      23.    Defendant **TCV Technology Crossover Ventures ("Ventures")**

27  formed TCV, and was an affiliate thereto.  Ventures is a private equity firm with the

28

1  same address as TCV.  Ventures is an owner, directly or indirectly, of JustFab and IB

2  Holding.  Ventures was an owner, directly or indirectly, of the Sensa Entities.  TCV

3  and Ventures both have offices in New York City and London.

4       24.    Defendant **John Drew** is a general partner of TCV and Ventures.  Upon

5  information and belief, John Drew was responsible for managing TCV' and

6  Ventures' investment in the Sensa Entities, JustFab, and IB Holding.  He served on

7  the board of directors of the Sensa Entities, and is a principle of IB Holding.

8       25.    The true names and capacities of the Defendants sued herein as **Does 1**

9  **through 10**, inclusive, are currently unknown to Plaintiff, who therefore sues such

10  Defendants by fictitious names.  Each of the Defendants designated herein as a Doe is

11  legally responsible for the unlawful acts alleged herein.  Plaintiff will seek leave of

12  Court to amend this Complaint to reflect the true names and capacities of the Doe

13  Defendants when such identities become known.

14       26.    Each of the Defendants acted jointly to perpetrate the acts described

15  herein.  At all times relevant to the allegations in this matter, each Defendant acted in

16  concert with, with the knowledge and approval of, and/or as the agent of the other

17  Defendants within the course and scope of the agency, regarding the acts and

18  omissions alleged.

19  **Plaintiff**

20       27.    Plaintiff **Susan Grace Stokes** is a citizen of Florida and purchased Sensa

21  from 2009-2013.  Ms. Stokes spent approximately $5,000 on Sensa products.  Ms.

22  Stokes was exposed to and relied upon Defendants' representations regarding the

23  weight loss efficacy of Sensa, as detailed herein, and but for those representations,

24  Ms. Stokes would not have purchased the Sensa products.  The product did not

25  provide the promised benefits.  Had she known the truth about the products and

26  Defendants' misrepresentations and omissions at the time of sale, Ms. Stokes would

27  not have purchased the Sensa products.

28

28.     Defendants' misrepresentations concerning the effectiveness of Sensa were an immediate cause of Plaintiff Stokes' decision to purchase Sensa.  In all reasonable probability she would not have agreed to purchase Sensa had she known that the misrepresentations were false and misleading.

29.     Defendants' misrepresentations played a substantial part, and so were a substantial factor in, Plaintiff Stokes' decision to purchase Sensa.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A).  There are more than 100 Class Members, and the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs.  At least one Class Member is a citizen of a state different than at least one Defendant.

31.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over Sensa Products because it was registered with the California Secretary of State to conduct business within California.  In addition, it conducted substantial business within California and the claims in this complaint arise out of that business.

33.     This Court has personal jurisdiction over Dr. Alan R. Hirsch because he purposefully directed his activities at California residents through his active participation in the fraudulent sale and marketing of Sensa crystals to California residents.  Specifically, Dr. Hirsch created Sensa crystals with the intention that they would be marketed and sold to California residents.  He has also appeared in television advertisements and infomercials promoting Sensa crystals that have aired

on television in California.  Dr. Hirsch has also promoted Sensa crystals on television programs that air in California such as Extra TV and KTLA Prime News.[5]

34.   This Court has personal jurisdiction over IBI because it is registered with the California Secretary of State to conduct business within California and is headquartered in California.  In addition, it conducted substantial business within California and the claims in this complaint arise out of that business.

35.   This Court has personal jurisdiction over JustFab because it is registered with the California Secretary of State to conduct business within California and is headquartered in California.  In addition, JustFab has substantial contacts with California and the claims in this complaint arise out some of those contacts.

36.   This Court has personal jurisdiction over IB Holding because it is registered with the California Secretary of State to conduct business within California and is headquartered in California.  In addition, JustFab has substantial contacts with California and the claims in this complaint arise out some of those contacts

**THE MARKETING OF SENSA**

37.   In early 2008, Dr. Hirsch and Sensa Products, LLC announced what was "[q]uite possibly the most important weight-loss discovery of the 21st century."[6] Through their website, they explained that Sensa is "an entirely NEW, clinically proven method of losing weight … [with] no food restrictions, and no change in lifestyle."[7]  These statements were false in at least three respects.

38.   First, Sensa was not "entirely NEW."  Dr. Hirsch had previously marketed his magic tastant crystals in 2004, at which time he called the product "Sprinkle Thin."  By 2005, Sprinkle Thin had been pulled from the market and the

---

[5] *See* Sensa in the News, Sensa.com, http://www.trysensa.com/news-stories.htm (last visited Jan. 16, 2014).

[6] *See* Try Sensa Website, www.trysensa.com (May 17, 2008), attached hereto as Exhibit A.

[7] *Id.*

company that had sold it was out of business.  So when the product was reincarnated as "Sensa crystals" in 2008, it was not "entirely NEW."

39.    Second, Sensa crystals were not a "clinically proven" method of losing weight.  In 2008, there was no reliable scientific evidence showing that Sensa crystals had any effect on weight loss, and no such evidence exists today.

40.    Third, the claim that Sensa could cause weight loss without dieting is a "red flag" weight loss claim which the FTC has found is "almost always deceptive."[8]

41.    The FTC identifies claims of scientific proof and doctor endorsements as common tactics used by weight-loss hucksters:

> And for those who remain skeptical, there is an answer. The products are backed by 'clinical studies' or are 'clinically tested' …. Even if they do not purport to be clinically proven, many claim to be the product of years of scientific research … or are doctor recommended.

FTC Staff Report at 6.

> Phrases like 'the clinically proven healthy way to lose weight,' 'clinically tested,' 'scientifically proven,' and 'studies confirm' bestow products with an aura of scientific legitimacy and aim to persuade consumers that they should feel confident that a product will work.

Id. at 17.  This tactic was at the very core of the Sensa scam, as nearly every element of the product labeling, every advertisement, and every page of the Sensa website

_____

[8]    Leslie Fair, "Weighing the Evidence: Substantiating Claims for Weight Loss Products," Federal Trade Commission, available at http://business.ftc.gov/documents/weighing-evidence-substantiating-claims-weight-loss-products ("The FTC has listed seven 'red flag' weight loss claims that are almost always deceptive.  Think twice before participating in the promotion of any product that says it can cause weight loss without diet or exercise …."); see also Federal Trade Commission, Gut Check: A Reference Guide for Media on Spotting False Weight Loss Claims, available at http://www.business.ftc.gov/documents/gut-check-reference-guide-media-spotting-false-weight-loss-claims (last visited Jan. 15, 2014) (explaining that claims a weight loss product["c]auses substantial weight loss no matter what or how much the consumer eats" are impossible "as a matter of science").

emphasizes that Sensa crystals are "[c]linically shown" to work by "clinical studies" and were "Doctor Formulated" by Dr. Hirsch following "20-plus years of research."

42.     When it launched in 2008, Sensa's website touted "more than 2 decades of research." *See* Exhibit A.  It stated that "Sensa's exclusive Tastant Technology is proven in clinical testing to produce an average weight loss of 30.5 pounds in just 6 months."  It further stated that "Sensa is the ONLY weight-loss system with this revolutionary technology and these amazing clinical results."  Under a link titled "Where's the Proof?," the website presented a bold headline stating "**Clinical Study Proved Average Weight Loss of 30.5 lbs!**"  Under that headline, the text read:

> In one of the largest clinical studies for a non-prescription weight-loss product ever conducted, 1436 men and women participants were instructed to sprinkle Sensa Tastants on all of their daily food for 6 months.  100 men and women participants were monitored in a placebo group.  The participants were not advised to change their regular diet or exercise and were weighed at the beginning and the end of the study.

> At the end of the 6-month study, the average weight loss of the Sensa Tastant group was 30.5 pounds, or an average of 5.1 pounds per month.  The placebo group only lost an average of 2 pounds.

43.     The statements identified in the foregoing paragraph were all false, misleading, and unsubstantiated.  First, despite the repeated references to a "placebo group," the purported 6-month clinical study was not placebo-controlled.  The references to a "placebo group" are simply false.  Dr. Hirsch later admitted the falsity of those statements and attributed them to a "misunderstanding."  Second, the purported "study" was so lacking in rigor that calling it "junk science" would probably overstate its validity.  The study does not appear to have been done at a clinic or medical facility; participants weighed themselves and reported their own weight losses with no outside checks.  They paid Dr. Hirsch $49 per month to participate.  More than a thousand participants dropped out, and no report of their weight loss, or gain, was made.  ABC News showed Dr. Hirsch's "study" to a former

1    Research Director of a National Institutes of Health-funded Research Center,

2    Professor R. Barker Bausell of the University of Maryland.  His reaction was to

3    "laugh out loud."[9]  According to Professor Bausell, Dr. Hirsch's research is beyond

4    worthless – it "has a negative value."[10]

5    44.    Prior to filing this action, Counsel retained an independent expert to

6    review Dr. Hirsch's purported "clinical study."  That expert examined the reports

7    from Dr. Hirsch's "study" and concluded that it is not scientifically credible and does

8    not support claims that Sensa crystals are effective for weight loss.

9    45.    Nevertheless, claims that Sensa crystals are "clinically proven" and

10   "clinically shown" to cause weight loss pervaded every aspect of Sensa's packaging,

11   labeling, advertisements, and marketing materials.  Front and center on the box,

12   shown below, is the statement "DOCTOR FORMULATED" in all caps, next to a

13   caduceus and the name Alan Hirsch M.D.  The "doctor formulated" claim and the

14   prominent display of a symbol of medicine were designed to bestow Sensa crystals

15   with the aura of scientific and medical credibility.  Further down the front center of

16   the box says:

17                                  SHAKE.

18                                  EAT.

19                                  LOSE.

20

21

22

23

24

---

25   [9]   Jim Avila, "Eat Ice Cream, Burgers and Pizza and Still Lose Weight?," ABC

26   NEWS, *available at* http://abcnews.go.com/print?id=5495808 (last visited Jan. 15,

27   2014).

28   [10]   *Id.*

---



46.     The back of the box features a photograph of Dr. Alan Hirsch, together with this text:

> About SENSA® Creator: Dr. Alan Hirsch, M.D., board-certified neurologist, has conducted over 25 years of research regarding the impact of smell and taste on weight loss.  This research culminated in the creation of the SENSA® Weight-Loss System.

These statements were also designed to bestow Sensa crystals with the aura of scientific and medical credibility.

47.     The back of the box also states "EFFECTIVE RESULTS 1436 men and women lost an average of 30.5 pounds in just 6 months *without changing their diet or exercise program.*" (emphasis added).  These statements were also designed to bestow Sensa crystals with an aura of scientific and medical credibility and to convey the message Sensa crystals are scientifically proven for effective weight loss.

48.     The back surface of the box features before-and-after photographs of a woman wearing a bikini with high-heels, together with representations that the woman "lost 35 lbs."  Near these photos, the following text appears: "studies show average weight loss of 30.5lbs in 6 months."

49.     Inside the box is a "GET STARTED!" package insert pamphlet.  The pamphlet contains before-and-after pictures of "Real Users" who got "Real Results,"

including a woman who "LOST 30 lbs," a woman who "LOST 25 lbs," a man who "LOST 30lbs," a man who "LOST 34 lbs," a woman who "LOST 35 lbs," and a man who "LOST 15 lbs."

50.   The pamphlet explains the "The Sensa 6-Month System" as follows:

> SENSA® is a 6-month weight-loss system.  Sensa® creator Dr. Alan Hirsch spearheaded one of the largest clinical studies on a non-prescription weight loss system, where 1,436 people lost an average of 30.5 pounds in 6 months.
>
> For best results, Dr. Hirsch recommends following the 6-month system in order.
>
> Each month is indicated by the number on the container and contains a different blend of Tastants.  You are given two shakers for each month: one to keep at home and one to carry with you.
>
> It is important to move on to the next month in the system after 30 days so you continue to lose weight.
>
> Start with Month 1, and shake SENSA® on everything you eat for 30 days.  After 30 days, move on to the next month in the system.  If you wish to continue past Month 6, simply start the system over with Month 1.

51.   The pamphlet goes on to explain the following in relevant part:

> Unlike traditional diets, SENSA® isn't based on restriction … During your first 60 days, it's crucial that you use SENSA® consistently … It may take some time for you to start seeing results.

52.   The pamphlet instructs users to take Sensa "From morning 'til night," and then provides the following daily Sensa consumption itinerary:

> Here's what a sample day looks like:
> 8 am Shake SENSA® on breakfast
> 8:15 am Take SENSA® COMPLETE
> 10 am Have a SENSA® CHEW and drink SENSA® QUENCH
> 12 pm Shake SENSA® on lunch
> 2 pm Drink SENSA® QUENCH

> 4 pm Have a SENSA® CHEW
> 6 pm Shake SENSA® on dinner

53.     The pamphlet asks "Skeptical?" and then provides the following reassurance:

> It's natural to have doubts when starting a new weight-loss program.  Many of our users initially questioned whether SENSA® would work, but they stuck with it and went on to reach their goals.

54.     The pamphlet concludes with answers to frequently asked questions, including:

> How long will it take until I lose weight?

> Although many people lose weight within the first month of using SENSA®, it may take a few months for others to start seeing results.  Stick with the 6-month system, and you can lose weight.

55.     Also inside the box is a "How To DVD."  The video on the DVD features Dayna Devon.

> "Hi!  You're here because you made the decision to lose weight.  Congratulations!  I'm Dayna Devon and I've lost 20lbs with the Sensa Weight-Loss System.  You know, Sensa has changed my life, and it's about to change yours too.  In the next ten minutes, I'm gonna tell you how easy it is to sprinkle the pounds away.  Now, get ready to discover the thinner, healthier, happier you."

56.     Dayna says:  Approximately 2 minutes and 55 seconds into the video, Dayna continues:

> "[Y]ou may be wondering what's in your tastants.  Looking at the ingredient list, you'll see that the tastants are made up of common ingredients that you would find in your own kitchen pantry.  That's right; Sensa contains only 100% FDA generally recognized as safe ingredients, so there's nothing harmful in Sensa.  In fact, Sensa is made up of just 4 simple ingredients.  The first ingredient, Maltodextrin, is derived from corn and found in cereals and canned fruits. The second ingredient, Tricalcium Phosphate, is commonly

found in juices and jams.  And the third ingredient, Silica, is an essential element that's found in leafy green vegetables. These three ingredients are combined with Dr. Hirch's flavor combinations to help you feel full and satisfied sooner, so you eat less.

If you've ever been on a restrictive diet, you may have noticed that you lose weight the first few weeks, but once your body gets used to the diet, you stop losing weight all together.  This is called the plateau effect.  Sensa shatters the plateau effect because your body never gets used to the tastants.  Over the course of the 6 month system there is a different proprietary blend of tastants each month so you continue to drop pounds.  **The introduction of new tastants every 30 days makes each month of Sensa as effective as the first.  Resulting in greater overall weight loss**.  *So you can reach your goal weight and transform your body in only 6 months.*

The entire 6 month system is ***Dr. Hirsch's prescription*** for weight loss success with Sensa.  ***Just like a doctor's prescription***, you need to follow it consistently in order to achieve your ideal weight.  So if you're looking to get the best results, stick with the system until you've met your goal.  Simply start with Month 1 and use it for 30 days. Then, move on to Month 2, and so on with Months 3, 4, 5, and 6.  If you wish to continue with the system after Month 6, cycle right back again with Month number 1.  You should always move on to the next month even if you have some tastants left over, this way you can achieve maximum weight loss.  There are two shakers in the program for each month.  One to keep at home, and one to always carry with you. The two shakers combined should last you 30 days if you are sprinkling on every meal and snack.  If you have a lot left over at the end of the month, start sprinkling Sensa more liberally and be sure you're using it every day.  On the other hand, if you run out of tastants before the end of the month, simply move on to the next month and try and sprinkle a little less next time. ***See, it really is as simple as sprinkle, eat, and lose weight***."

57.     Approximately 7 minutes and 25 seconds into the video, Dayna explains the "science behind Sensa" as follows:

> "Alright, now let me tell you about the science behind Sensa. **This weight loss revelation is the result of 25 years of research and testing by the world's leading expert on the science of taste and smell, Dr. Alan Hirsch.** Dr. Hirsch has written 7 books on the subject, conducted and published more than 180 research studies, and holds multiple patents relating to the science of smell and taste. His research has been cited in major publications, including the New York Times, Time Magazine, and USA Today. And he's been a guest on TV programs such as the Today Show, Dateline NBC, CNN, The CBS Early Show, Good Morning America, and Extra. During the course of his pioneering research Dr. Hirsch discovered the groundbreaking secret behind Sensa that's changed the way the world looks at weight loss. He tested more than 4,000 tastants to determine the specific combinations that promoted maximum weight loss."

58.     Approximately 8 minutes into the video, Dr. Alan Hirsch appears and states:

> "I've found that hunger isn't controlled by your stomach; it's controlled by your brain. We don't overeat just because we're hungry, it's because we love to eat, and diets don't stop you from wanting to eat. They just stop you from eating what you want, and that's a recipe for failure."

59.     Approximately 9 minutes into the video, a Dr. Nancy Zamora appears and claims:

> "Sensa is different than a diet because you sprinkle it on your food, and this then makes you feel fuller faster, and therefore you're eating smaller portions."

60.     At the end of the video "real users" share their experiences with Sensa. Roger Shultz states:

> "I have lost 75 pounds with Sensa…I've always liked food, it's food, fun and football on Friday, Saturday and

Sunday.  So now with Sensa I found something where I can continue to eat the food that I like, and I am shaking Sensa on my food…you just take it sprinkle on your food and that's it"

61.   Wendy explains:

"I've lost 125 pounds with Sensa.  I tried everything before Sensa, and nothing had worked.  Then, I got brave and decided to try one more thing.  When I started Sensa, I didn't change my eating habits.  I just sprinkled Sensa, and I lost 7 pounds the first month.  With Sensa I could eat wherever I wanted, I love Mexican food."

62.   Tim shares:

"I've lost 67 pounds using Sensa … I ordered Sensa and just carried on with my normal life, only I was sprinkling Sensa on all my food at every meal that I had.  At the end of 9 months, I had lost 67 pounds… Sensa really works."

63.   Finally, Dorris concludes:

"I've lost 45 pounds with Sensa ... and I'm back in the saddle."

64.   Sensa was promoted and sold through the Sensa Website, www.sensa.com, and Try Sensa Website, www.trysensa.com.

65.   During the class period, visitors to the Try Sensa, www.trysensa.com, were greeted by a video featuring Dayna Devon, depicted in the image below[11]:

---

[11]   Now available on Sensa's Official YouTube channel at http://www.youtube.com/watch?v=sp2PA0rNJvE.



Dayna states:

> "Hi, I'm Dayna Devon.  I've been a reporter and broadcast
> journalist for more than 20 years.  So when my producers
> asked me to do a story on a weight loss product called
> Sensa, I thought, hmmmm, this product sounds too good to
> be true.  You may have read about Sensa in the New York
> Times and Time Magazine or seen it on Dateline NBC.
> Sensa's been getting lots of media attention because of a
> landmark 6-month research study [onscreen graphic:
> "Doctor Formulated!  1436 men and women lost an average
> of 30 lbs"] in which 1,436 people lost an average of over 30
> pounds.  And here's the really amazing part: they did it
> without taking pills, stimulants, or counting calories.
> Sounds too good to be true right?  Yep, I thought so too,
> until I tried Sensa for myself.  It's just one of those things
> that you have to try to see how easy it is to lose weight.
> That's why we put together an absolutely incredible offer.
> For a limited time, we'll send you the complete Sensa
> starter kit to try for 30 days with no obligation to buy.

Hundreds of thousands of people have said yes to this offer. And you know what?  They've lost over a million pounds. [Onscreen graphic]



Look at these before and after shots.  These are all people who have lost lots of weight with Sensa.  Look at them! [Onscreen graphics]





They're almost unrecognizable from their before photos. Sensa worked for them, and it will work for you, too. Satisfaction guaranteed. In fact, we are so confident that you'll lose weight with Sensa, we don't want you to pay for it unless you see the results you want. That's an offer you won't find anywhere else. You've got nothing to lose, except unwanted pounds."

66. During the class period, visitors to the Sensa Website, www.sensa.com, found Octavia Spencer "Award-Winning Actress" who claims, "Sensa® changed my life, not my lifestyle. I lost 20 pounds." Below Octavia Spencer's endorsement, the website states that Sensa is "Easy," "Effective," and "Doctor Formulated."



## THE ADVERTISING OF SENSA IS DESIGNED TO BESTOW SENSA CRYSTALS WITH A FALSE AURA OF SCIENTIFIC AND MEDICAL CREDIBILITY

67.    During the class period, the Sensa's websites included detailed information on two purported clinical studies that supposedly support Sensa's advertising.  The "Success Stories" section of the Sensa Website refered to "Studies" showing an average weight loss of "30.5 lbs in 6 months."[12]  But no reliable randomized study has been conducted using Sensa crystals.

68.    After reviewing the reports from both purported "studies," an independent expert concluded that neither "study" is scientifically credible, and neither "study" supports the claims that Sensa crystals are effective for weight loss. In fact, both studies are unreliable and invalid.

69.    When addressing claims that these kinds of weight-loss product have been shown effective in clinical studies, the FTC Staff Report on Weight Loss Advertising comments:  "Although some advertisements briefly describe the results, and provide some information about the methodology of a particular study, such as the study's duration and number of participating subjects, most of the advertisements fail to give consumers sufficient detail about a study to allow consumers to verify the advertiser's representations."  FTC Staff Report at 17.

70.    As demonstrated by the recent FTC suit against Sensa, neither the advertisements nor the additional materials available through the website provide sufficient information to determine the validity of the Sensa study.  In fact, the FTC recently condemned Defendants' claim that Sensa was clinically proven and their claim that studies were conducted by an independent laboratory, stating the claims were "false" and "deceptive act[s] or practice[s]."  *See* FTC Complaint, *FTC v. Sensa Products, LLC., et al*, Case No. 14-cv-71, attached hereto as Exhibit B, at 17-19.

---

[12] *See* Success Stories, Sensa.com, http://www.sensa.com/success-stories.htm (last visited April 30, 2013).

71.     The FTC's claims are well supported.  For example, the one-page poster of the purported "Double-Blind Placebo-Controlled Lab Study" does not identify an author or the facility where the study was done.  It does not provide any information on how many participants were assigned to the test and control groups, nor does it provide any information about what statistical tests, if any, were done to analyze the data.  However, prior to filing this complaint, Plaintiff's counsel requested that Defendants provide more detailed data from the studies.  Plaintiff's counsel subsequently provided the data to an independent expert for review.  That expert concluded that the data was not scientifically credible and does not support claims that Sensa crystals are effective for weight loss.

72.     Apparently, the Sensa Medical Advisory Board "brings extensive knowledge of obesity and its related issues to [the Sensa] program."  However, none of the advisory board "medical doctors" have researched Sensa, and none participated in the formulation of Sensa.  Their biographies are included in Sensa promotional materials to create an illusion that doctors in the medical community, other than Dr. Hirsch, support the claims that Sensa causes weight loss.

**DR. HIRSCH'S "GROUND BREAKING RESEARCH STUDY" IS FATALLY FLAWED, INVALID, AND UNRELIABLE**

73.     During the class period, the main page of the Sensa Website, www.sensa.com, included the phrase "DOCTOR FORMULATED" and the image below.  Similarly, the website Try Sensa, www.trysensa.com, included the phrase "CLINICALLY PROVEN" along with the text and images below:





74.    The main page of the Sensa website also includes a tab entitled "OUR FOUNDER," which links to a page entitled "DOCTOR FORMULATED."[13] During the class period, below the title "DOCTOR FORMULATED," the website included detailed information about Dr. Alan Hirsch, the "Creator of the SENSA® Weight-Loss System," as well as a bar chart that depicts the supposed results of "Dr. Hirsch's Ground-Breaking Research Study."



With regard to the creator of Sensa, the website stated:

---

[13] *See* Doctor Formulated, http://www.sensa.com/doctor-formulated.htm (last visited Jan. 15, 2014).

> Award-winning neurologist Dr. Alan Hirsch has devoted 25 years of research to the science of smell and taste, leading him to develop the patented technology behind SENSA®.
>
> He has published over 200 research studies exploring how smell and taste affect human behaviors.
>
> His awards and appointments include receiving the prestigious Peter Bassoe Award from The Chicago Neurological Society and serving as the Honorary Chairman of the Physician's Advisory Board to the National Republican Congressional Committee.
>
> - Board-certified neurologist and psychologist
> - Director of the Smell & Taste Treatment and Research Foundation in Chicago
> - Nation's leading authority on the science of smell and taste
> - Author of 8 books on the science of smell and taste
> - Featured on Dateline NBC, CNN and Good Morning America.

*See id.* These statements are designed to bestow Sensa crystals with an aura of scientific and medical credibility.

75. Further down on the page, below the heading "Dr. Hirsch's Ground-Breaking Research Study, the text states:

> During his career, Dr. Hirsch observed that many patients who had lost their sense of smell due to head trauma frequently gained 20-30lbs. This prompted him to hypothesize that if losing one's sense of smell could lead to weight gain, could the opposite be true … **could enhancing one's sense of smell lead to weight loss?**
>
> After painstaking research and testing, Hirsch created a blend of edible "Tastants" that he believed would enhance the smell and taste of food and eventually lead to weight-loss. He then tested those sprinkles in one of the largest

> research studies ever conducted on a non-prescription
> weight-loss product.
>
> During his study, 1436 women and men sprinkled the
> scented, flavorless "Tastants" on everything they ate during
> a 6 month period and they lost an average of 30.5 pounds.
> Those in the control group lost only 2 pounds, on average.
>
> Now, Dr. Hirsch's breakthrough "Tastants" are available to
> everyone as SENSA® and hundreds of thousands of people
> have lost weight on the system.

*See* a copy of the webpage attached hereto as Exhibit C.  These statements are accompanied by a bar chart, shown below, depicting the "results" of the purported clinical study that compared Sensa crystals to a placebo.



76.    The webpage also provided a link labeled "View the 1436-person research study" that links to an "Abstract Poster of Use of Stimuli for Weight Loss" (the "Abstract") instead of a full version of the purported research study.  That Abstract is attached hereto as Exhibit D.

77.    The Abstract merely recites the statements included on the website and does not provide any additional information that could be used to test the validity of

the study.  The Abstract again states that "[o]ne thousand four hundred and thirty-six patients completed this study," and "[t]he average weight loss for the test group was 30.5 pounds."

78.     Rather than seeking to evaluate the hypothesis that using edible Tastants results in weight loss, the Abstract states that the research was conducted to reach the desired outcome: showing that Tastants cause weight loss.  In that connection, the abstract states that the "[t]he objective of this study is to demonstrate that non-caloric tastant crystals sprinkled on food prior to consumption will enhance gustatory evoked satiety, reduce consumption, and represent itself by a reduction in weight."  Dr. Hirsch's "objective" study indicates that he intended to support the claims about Sensa, the product he created, and that he did not set out to perform credible research or to test a hypothesis.

79.     The Abstract also states that only 100 subjects were included in the non-treated, placebo group while 2,437 overweight or obese subjects were given "tastant crystals."  In other words, the study compares a test group that is over 24 times the size of the control group.  The Abstract also does not state whether the control subjects were overweight or obese like the test group.  The study's methodology and the study groups used are invalid.

80.     Based on available information, an independent expert concluded that Dr. Hirsch's study is fatally flawed and unreliable.

**THE STUDY CONDUCTED BY THIRD PARTY BATTS LABORATORIES IS EITHER FAKE OR THE PRODUCT OF GROSS INCOMPETENCE**

81.     During the class period, the Try Sensa website, www.trysensa.com, also included a tab entitled "CLINICALLY PROVEN," which linked to information on a purported clinical study conducted by a third party.  A true and correct copy is attached hereto as Exhibit E.



82.     The "Double Blind, Placebo-Controlled Lab Study" was conducted by BATTS Laboratories, and it purportedly supports Dr. Hirsch's flawed research.

83.     The BATTS study, co-authored by Charlotte Kiosea and Dr. Marlowe Schneidkraut, is riddled with false statements and errors.

84.     The Study Director, Charlotte Kiosea, admitted in her deposition on December 14, 2011, that **all of BATTS' paper files had been shredded and used by Ms. Kiosea's cats as kitty litter** in April or May of 2011.  *See* 12/14/2011 Deposition of Charlotte Kiosea, attached hereto as Exhibit F, at 235:12-18. According to Ms. Kiosea, the electronically stored documents were lost because they were all on one computer that "crashed" in 2009.  *Id.* at 282:9-25.

85.     Charlotte Kiosea, the "Study Director," was the sole author of the protocol used for the study, and the "single point of study control…with ultimate responsibility for the overall scientific conduct of the study." *Id.* at 133:14-24.  But Ms. Kiosea is not a scientist:

> Q:     So you would not describe yourself as a scientist?
> A:     No.

*Id.* at 134:19-21.  She admits that she is not qualified, by training or experience, to conduct a study according to the FDA's Good Laboratory Practices (GLP) or Good Clinical Practices (GCP) standards.  *Id.* at 130:6-8 ("I will never be a study director on a GLP study.  I cannot be one, because my background does not qualify me to be one … I don't have the experience and formal education to do a GLP study *in vitro* or *in vivo*."); *id.* at 157:5-10 ("Q: You are not qualified by education, training, or experience to be an investigator in a clinical study … Is that accurate? … A: Yes.  It is accurate…").

86.    Ms. Kiosea has no training or experience that would qualify her to conduct a clinical study.  She has the equivalent of a bachelor's degree in economics from the Academii de Studii Economise in Buchareset, Romania.  *Id.* at 15:8-14.  From 1994 through 1998, she worked as a receptionist and manager at a veterinary hospital.  *Id.* at 22:18-23.  From 1998 through 2003, she worked as a travel agent, first at Bertelsmann Industries, then for a variety of small airlines.  *Id.* at 24:20-21; 26:12-16.

87.    BATTS Laboratories was founded by Ms. Kiosea's husband, Matai Kiosea.  Matai Kiosea made his son, Nick Codim Kiosea, a partner in BATTS Laboratories after he graduated.  Charlotte Kiosea joined her husband's company in 2003 as a "volunteer."  *Id.* at 29:2.  She was "handling all the operations from cleaning the floors and monitoring the construction to everything."  *Id.* at 29:14-19.  Eventually, her husband gave her the title of "chief of operations."  *Id.*  ("My husband said you should probably be in charge of operations; and that's what it was.").

88.    No medical doctors were involved in the BATTS study.  *Id.* at 159:15-20.  Ms. Kiosea took the medical history for each participant.  *Id.* at 102:3-5.  The BATTS report makes reference to an "Institutional Review Board (IRB)."  *Id.* at 155:16-24.  But Ms. Kiosea admits there was no IRB.  *Id.* at 156:5 ("Correct, there was no IRB ….").  The BATTS report makes reference to "[m]onthly clinic visits"

and "clinic controlled weighing processes." *Id.* at 222:10-19; 242:1-4.  But Ms.

Kiosea admits there was no clinic:

> Q: Where was the clinic?
>
> A: Well, if I would have said performed human control weighing process, it doesn't sound the way it's supposed to sound.  …
>
> Q: Okay.  So even though there's a reference to clinic here, there was no clinic involved in this study, right?
>
> [Objection omitted.]
>
> THE WITNESS:    Of course, not.

*Id.* at 222:20-223:9.

89.     Based on her reports and the other written materials available, Ms. Kiosea could not determine the number of participants enrolled in the study.  Nor was she able to determine how many participants completed the study.  *Id.* at 185:9-16. The first paragraph of her report states that 78 volunteers completed the first four months of the study.  The second paragraph states that 81 completed a two month extension, consisting of "47 and 32 for the placebo and test article groups respectively."  *Id.* at 195:10-22.  Ms. Kiosea admits that 47 +32 = 79, not 81, and not 78.

> Q: So we know that this 47 plus 32 is 79.
>
> A: Right.
>
> Q: That still doesn't match up to the 78 in the first paragraph.
>
> A: Right.

*Id.* at 196:18-22.  Elsewhere Ms. Kiosea's report states 100 participants were enrolled, and 7 dropped out.  *Id.* at 235:24-236:9.  These figures suggest 93 completed the study, not 78, 79, or 81, as other figures in the report suggest.

90.     Ms. Kiosea had no explanation for these discrepancies.  *See id.* at 250:20-256:10.  Instead she admitted her report was riddled with errors and that she was unqualified to do the study:

> "[Y]eah, there were mistakes, okay.  I didn't verify the data because I didn't have it anymore.  I might be an idiot, nonqualified, and not a scientist to do this test, but there were so many entities around me that didn't see the mistakes, I wonder who in QVC,[14] in my report, didn't see the mistakes."

*Id.* at 263:8-13.

91.     Ms. Kiosea's daughter, Dolly Kiosea, is a paralegal who is not formally employed at BATTS.  *Id.* at 71:1-2.  However, she played a number of interesting roles in this study.  She was a participant in the study.  *Id.* at 209:1-18 ("I even paid her.  She was huge.").  She performed some of the statistical analysis of the data.  *Id.* at 269:9-10 ("[S]he helped me with the calculation of the statistical data.").  She communicated with the sponsor about the calculations.  *Id.* at 269:14-17 ("I think she knows a little better to express herself in English than myself.").  Finally, she gave a testimonial for Sensa after the study was done.  *Id.* at 327:3-6 ("Q:  Did your daughter ever give a testimonial for Sensa?  A:  Oh, yes.  She landed a husband after Sensa.  She was happy.").

92.     After Charlotte Kiosea collected the data, and Dolly Kiosea performed the statistical analysis of the data, Luis Munoz verified the statistical analysis emailed to him by Charlotte Kiosea.  *Id.* at 313: 6-11.

---

[14]   QVC is a television shopping channel that was receiving interim reports of the data from the BATTS study.  *See id.* at 125:15-20; *see also id.* at 124:18-21 ("They [the Sensa Entities] were pestered, as I remember, by QVC or Home Shopping Network, but one of these, and it was an ongoing study.  My agreement with this company was that they are provided with the data, so I sent the data.").

93.     After reviewing the reports from the research study, an independent expert retained by counsel for Plaintiff concluded that the "study" is not scientifically credible, and it did not support claims that Sensa crystals are effective for weight loss.

**THE SENSA MEDICAL ADVISORY BOARD IS DESIGNED TO LEGITIMIZE SENSA'S FALSE ADVERTISING AND TO DECEIVE CONSUMERS**

94.     During the class period, the Sensa Website also included a tab at the top labeled "MEDICAL ADVISORS," which linked to the page about the "Sensa Advisory Panel."  Sensa Advisory Panel, Sensa.com, http://www.sensa.com/advisory-panel.htm, attached hereto as Exhibit G.  Below the headline "SENSA® MEDICAL ADVISORY BOARD," the text states:

> "The SENSA® Medical Advisory Board consists of leading medical doctors from across the country who provide independent counsel on a range of health and weight-loss related issues.  Each member brings extensive knowledge of obesity and its related issues to our program."

Beneath the text are headshots and biographies of the members of the so-called "Medical Advisory Board."



## DEFENDANTS DISREGARDED A PERMANENT INJUNCTION BY CONTINUING TO MAKE FALSE AND MISLEADING REPRESENTATIONS BASED ON INCOMPETENT AND UNRELIABLE SCIENTIFIC EVIDENCE

95.     The People of the State of California, represented by the District Attorneys for the counties of Santa Cruz, Alameda, Marin, Monterey, Orange, Napa, Santa Clara, Solano, and Sonoma  filed a civil complaint in the Santa Cruz County Superior Court against Defendant Sensa Products, and IBI.  The People alleged that the Sensa Entities engaged in unfair competition, as defined in CA Bus. and Prof. Code §17200, and in violations of Business and Professions Code §17500.

96.     On November 20, 2012, the Sensa Entities stipulated to entry of final judgment in *People of the State of California v. Sensa Products, LLC et. al.*, Case No. CV 175655 (CA Superior Court, Santa Cruz County).  The Final Judgment Pursuant to Stipulation is attached hereto as Exhibit H.

97.     The Sensa Entities stipulated to the permanent injunction with no intention of changing their practices.

98.     The Final Judgment Pursuant to Stipulation states the following in relevant part:

> Defendants, in connection with the manufacturing, labeling, advertising, offering for sale, sale, or distribution of any NUTRITIONAL SUPPLEMENT, are hereby permanently enjoined and restrained …from engaging in, directly or indirectly, any of the following acts or practices: …
>
> (B) [M]aking and/or disseminating any representation, either directly or indirectly, about the effects, efficacy, or safety of any NUTRITIONAL SUPPLEMENT unless a the time of making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE that substantiates such representation;
>
> (C) Making and/or disseminating any representation, either directly or indirectly, that misrepresents the existence, contents, validity, results, conclusions, or interpretations of any test, study or research relied upon that substantiates such representation;…
>
> (E) Making and/or disseminating any representation, either directly or indirectly, that any NUTRITIONAL SUPPLEMENT: (1) causes, assists, or contributes to weight loss and/or fat loss; (2) causes, assists, or contributes to any increase in metabolism and/or fat burning; unless, at the time of making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – concerning the NUTRITIONAL SUPPLEMENT, or an ESSENTIALLY EQUIVALENT PRODUCT for which the claims are

being made and/or disseminated – that substantiates such representation;

(F) Making and/or disseminating any representation, either directly or indirectly, that the health benefits, performance, efficacy, safety or any aspect of any NUTRTIONAL SUPPLEMENT has been clinically proven or clinically tested, unless, at the time of making or disseminating such representation, it is true and not misleading, and Defendants already have in their possession and rely on COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – that includes at least one adequate and well-controlled human clinical study that is randomized, double-blind, placebo-controlled, and conducted by persons qualified by training and experience to conduct such study performed on the NUTRITIONAL SUPPLEMENT, or on an ESSENTIALLY EQUIVALENT PRODUCT for which the claims are being made and/or disseminated – that substantiates such representation."

(G) Enrolling any customer in any automatic shipment program without first providing the customer with a clear and conspicuous disclosure of the customer's obligation under the program, and obtaining the customer's affirmative consent to the agreement to enroll the customer in the program and assume the obligations of the program at the time the automatic shipment program is ordered by the customer;

(H) Violating Civil Code § 1584.5, which provides in pertinent part, no person, firm, partnership, association, or corporation, or agent of employee thereof, shall in any manner, or by any means, offer for sale of goods, wares, merchandise, or services, where the offer includes the voluntary and unsolicited sending or providing of goods, wares, merchandise, or services not actually ordered, requested by the recipient, either orally or in writing. The receipt of any goods, wares, merchandise, or services shall for all purposes be deemed an unconditional gift to the recipient who may use or dispose of the goods, wares,

merchandise, or services in any manner he or she sees fit without any obligation on his or her part to the sender or provider;

(I) Continuing to bill after shipping direct sale products to a customer after a customer's request has been made, consistent with California law and the instructions on Defendants' website or with the ordered products, to be taken off Defendants' shipping list or to cancel the customer's continuity order; provided however, if Defendant reverses such billing, within 30 days, the billing shall not constitute a violation of this paragraph.

99.     The Sensa Entities continued to violate Subparagraph (B) by making false and misleading representations about the efficacy of Sensa and by relying on incompetent and unreliable scientific evidence for a substantial part of the class period.  Defendants have no evidence that substantiates their representations about the efficacy of Sensa.

100.   Defendants continued to claim that BATTS Laboratories and Dr. Hirsch have conducted valid research that substantiates their claims about the efficacy of Sensa.  Those claims are false.  For a substantial portion of the class period, the Sensa Entities continued to rely on junk science in violation of Subparagraph (C).

101.   Similarly, the Sensa Entities continued to violate Subparagraph (E) because they made and disseminated representations that Sensa "causes, assists, or contributes to weight loss and/or fat loss," even though Defendants did not "already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE."

102.   The Sensa Entities' practices also violated Subparagraph (F). Defendants represented that Sensa had been "clinically proven" to cause weight loss and that Sensa has been "clinically tested" such that studies show an average weight loss of 30lbs in 6 months.  Defendants had no scientific evidence.  Nor did Defendants have scientific evidence "that includes at least one adequate and well-

1  controlled human clinical study that is randomized, double-blind, placebo controlled,

2  and conducted by persons qualified by training and experience to conduct such study

3  performed on [Sensa]."  BATTS Laboratories' so-called double-blind, randomized

4  study was turned into kitty litter by its "Study Director."   This "Study Director,"

5  Charlotte Kiosea, has experience as a travel agent and as a receptionist but had no

6  experience that would qualify her to perform a well-controlled clinical study.  The

7  available information on Dr. Hirsch's study demonstrates that his study was not

8  double-blind, or well-controlled, and was entirely inadequate.

9      103.   Even though, under Subparagraph (G), the Sensa Entities are enjoined

10  from "[e]nrolling any customer in an automatic shipment program without first

11  providing the customer with a clear and conspicuous disclosure of the customer's

12  obligation under the program, and obtaining the customer's affirmative consent to the

13  agreement to enroll the customer in the program and assume the obligations of the

14  program," Defendants offered a "30 day free trial offer" with a catch:  after customers

15  sign up for a 30 day free trial, customers are sent Sensa month number one, and,

16  unexpectedly, Sensa month number two.  Defendants did not conspicuously notify

17  customers that if the second month of Sensa was not sent back, an automatic charge

18  for both months will follow.

19      104.   When a customer called to ask for the free trial to be cancelled,

20  Defendants would not cancel the "customer's continuity," as required by

21  Subparagraph (I).  Because Defendants provide no conspicuous notification,

22  customers were surprised to learn that the second month of Sensa had to be sent back,

23  or an automatic charge for both month one and month two would follow.

24      105.   In violation of Subparagraph (H) and Cal. Civil Code § 1584.5, the

25  second month of Sensa is anything but an "unconditional gift," because Defendants

26  charged customers unless they sent the second month of Sensa back.  Even if the

27  Sensa was sent back, customers still paid shipping for the "free trial."

28

106.   The People of the State of California took the Sensa Entities to task for their false advertising and spurious science, and California entered into an agreement with Defendants permanently enjoining them from engaging in unfair competition. But, Defendants had no intention of changing their practices.  Instead, Defendants did not change their marketing strategy and continued to claim that "studies show average weight loss of 30lbs" with Sensa.

## THE FTC ENTERED INTO A STIPULATED JUDGMENT FOR $46.5 MILLION AGAINST DEFENDANTS GOLDENBERG, HIRSCH, SENSA PRODUCTS AND IBI

107.   On January 7, 2014, the FTC brought suit against Defendants for unfair or deceptive practices and false advertisement in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§45(a) and 52.  Like the Plaintiff in this case, the FTC claimed Sensa does not work.  The FTC asserted that Sensa is ineffective at producing weight loss without diet, exercise, or feeling hunger, as Defendants' claim. The FTC further claimed Defendants' assertion that Sensa is "clinically proven" is categorically false, and Defendants' representation that the product was proven effective in an independent study was also false, misleading, and deceptive. Additionally, the FTC claimed Defendants acted deceptively and falsely advertised Sensa by failing to disclose "material connections" with consumer endorsers.  This includes the fact that endorsers received incentives to appear in advertisements, including monetary compensation, free trips, and TV appearances.

108.   With respect to Defendant Hirsch, the FTC claimed he provided "unsubstantiated expert endorsement claims."  Amongst other allegations, Defendant Hirsch deceptively and falsely represented that Sensa causes substantial weigh loss without diet and exercise, that users will lose the weight without feeling hungry, and that Sensa is "clinically proven" to result in 30 pounds of weight loss in six months. The FTC further claimed that Hirsch provided Defendants with deceptive and misleading scientific, promotional, and other materials for the marketing and sale of

1   Sensa, therefore supplying them with the means and instrumentalities for commission

2   of deceptive acts and practices.

3      109.    As a result of these claims, the FTC and Defendants Goldenberg, Hirsch,

4   Sensa Products and IBI entered into a stipulated judgment for $46.5 million.  The

5   Stipulated Final Judgment is attached hereto as Exhibit I.  The judgment also

6   enjoined Defendants from making misleading claims that Sensa causes or helps

7   weight loss.  Unlike the junk science Defendants relied upon and that is described in

8   this complaint, Defendants agreed that all future representations surrounding Sensa's

9   efficiency must be backed by "competent and reliable" scientific research.

10     110.    Ultimately, the FTC suit resulted in the insolvency of the Sensa Entities

11   and both companies filed for bankruptcy on or around October 17, 2014.

12                        **THE *HIRSCH* ACTION**

13     111.    On May 13, 2015, Sensa Products, by and through their bankruptcy

14   counsel, filed an action against Defendant Alan Hirsch.  *Sensa v. Hirsch*, BC581772

15   (Los Angeles Sup. Ct. May 13, 2015) (hereinafter the "*Hirsch* Action").  The *Hirsch*

16   Action admits Sensa Products, IBI, and Alan Hirsch acted in concert to deceive the

17   public regarding the efficacy of Sensa, stating that since at least 2011 "… many of

18   Sensa's claims were false or overstated. … Sensa repeatedly claimed that a study

19   showed that study participants lost an average of thirty pounds over six months

20   through the use of Tastants. … [Sensa Products] is informed and believes that the []

21   Study contained many fatal flaws….  In short, the [] Study did not meet minimum

22   requirements for clinical research and could not serve as the basis for Sensa's

23   efficacy claims."  *See* Exhibit J, *Hirsch* Complaint, at 436.  Accordingly, the

24   Defendants have been on notice for the duration of the class period that their clinical

25   evidence is "fatal[ly] flaw[ed]." *Id.* at 6.

26

27

28

112.   Further, in the *Hirsch* Complaint, Sensa Products admits that it was insolvent no later than October 17, 2013, but the company nevertheless continued to engage in business and transactions.  *Id.* at 10.

113.   The *Hirsch* Complaint describes, in part, Defendants Hirsch, Ressler and Goldenberg's active de-capitalization of the Sensa Entities through distributions and advancements to Dr. Hirsch.  In 2010, Defendants Hirsch, Goldenberg and Ressler organized the formation of Sensa Products and the compensation structure of Dr. Hirsch.  *See* Ex. J at 27-48.  In 2012, Defendant Goldenberg personally signed the 5th Amendment to the Sensa Products LLC Agreement that authorized millions of dollars in advancements to Dr. Hirsch.  *See id.* at 56-57.  Of the $37,000,000 Sensa Products claimed as yearly profit between June 2008 and October 2014, almost $11,000,000 was distributed and advanced to Dr. Hirsch.  *See id.* at 4.  The *Hirsch* Complaint details the timing of these distributions and advancements:[15]

> Plaintiff is informed and believes that Sensa [Products] made $733,127 in yearly profits between January 1, 2012 and December 31, 2012. Plaintiff is informed and believes that Defendant Hirsch's share of these profits is $73,313 and that Defendant Hirsch received approximately $94,909 in distributions.  Plaintiff is informed and believes that Defendant Hirsch received at least $3,071,600 in Advances from Sensa [Products] in Fiscal Year 2012.

> Plaintiff is informed and believes that Sensa [Products] made no yearly profit between January 1, 2013 and December 31, 2013 and in fact lost more than $26,000,000.  Plaintiff is informed and believes that Defendant Hirsch received at least $2,642,000 in Advances from Sensa [Products] in Fiscal Year 2013.

> Plaintiff is informed and believes that Sensa [Products] made no yearly profit between January 1, 2014 and October 17, 2014, but defendant Hirsch received $600,000 in Monthly Advances.

114.   As creditor and consumer liabilities loomed, Defendants continued to bail money from Sensa Products into the pockets of Defendant Hirsch.  Even worse,

---

[15] *Id.* at 5

1   Sensa Products continued to advance Dr. Hirsch $600,000 *after* the FTC filed its

2   action against the Sensa Entities on January 7, 2014.  Defendants used systematic

3   loans to de-capitalize Sensa Products and avoid liability to consumers and creditors.

4       115.   Plaintiff adopts the *Hirsch* Action's allegation that Defendant Hirsch,

5   Ressler, Goldenberg, and Chadwick received distributions from the Sensa Entities

6   while the companies were operating.  *See Id*. at 11.  Upon information and belief,

7   they continued to receive these payments and conduct business as the FTC liability

8   loomed and the financial condition of the Sensa Entities approached insolvency.  The

9   authorization of such distributions and advancements, in the face of looming liability,

10  was an abuse of the corporate form and indicates domination of the Sensa Entities by

11  the other Defendants.

12                          **THE *WINDMILL* ACTION**

13      116.   Windmill Health Products, LLC ("Windmill") contracted with the Sensa

14  Entities to handle distribution of Sensa.  Simply put, Windmill dealt with the retailers

15  for Sensa.  When these retailers became aware that Sensa was a fraud, the retailers

16  returned the product en masse to Windmill.  Under the terms of their contract with

17  Windmill, the Sensa Entities were responsible to pay for the returns.  Unfortunately

18  for Windmill, the Sensa Entities went bankrupt in the wake of the FTC settlement.

19  Windmill, however, rejected Defendants' contention that there was no money left.

20  Instead, Windmill brought an action against the owners, officers, and affiliates of the

21  Sensa Entities who played a role in, and profited from, the deception of Windmill.

22      117.   On October 3, 2016, Windmill Health and Vitaquest International, Inc.

23  filed their Fifth Consolidated Amended Complaint (the "*Windmill* Complaint")

24  against Defendants TCV VI, Drew, Ressler, Goldenberg, Chadwick, IB Holding,

25  JustFab, and Brand Ideas.  *See Windmill Health Products, LLC, et al., v. TCV VI, LP,*

26  *et al.*, Case. No. BC561252 consolidated with BC576327 (Los Angeles Sup. Ct. Oct.

27

28

---

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT         CASE NO. 14-CV-51 JLS (WVG)

3, 2016) (the "*Windmill* Action").[16]  The *Windmill* Action plaintiffs generally allege that Defendants fraudulently misrepresented the solvency of the Sensa Entities and actively de-capitalized the Sensa Entities to avoid paying the plaintiffs' contract damages.  *See* Ex. at 1-5

118.   Specifically, the *Windmill* Action plaintiffs alleged that the above named Defendants "promoted and sold millions of dollars of diet products with false and misleading statements regarding the product culminating in Sensa's insolvency after the Federal Trade Commission obtained a $46.5 million judgment against Sensa [Products] and its parent, [IBI]. … for false and deceptive practices."  Ex. K at 1. Further, these plaintiffs allege that while Defendants where negotiating fines with the FTC they were busy fraudulently concealing the insolvency of the Sensa Entities and hiding transfers of some $26,000,000 from the Sensa Entities to Defendant JustFab "in an effort to defraud creditors…."  *Id* at 3.

119.   The *Windmill* Complaint further explains that Defendants' business organization is so interconnected that the other Defendant entities and individual Defendants should be liable for the debts of the Sensa Entities:[17]

> [a]ll of the Defendant entities and the individual Defendants are part of a web of companies that exist as one economic group.  By pursuing a single purpose, they seek to generate large assets while seeking to avoid liability by disbursement of asserts to the numerous entities.  All entities are, therefore, responsible for the acts of their related entities.
>
> …
>
> At the other Defendants' direction, [the Sensa Entities] were grossly undercapitalized and unable to satisfy their debts as they became due, including their multi-million dollar debt to Windmill as well as Sensa's multi-million dollar fine owing to the FTC.

120.   The *Windmill* Action plaintiffs then provided a detailed factual summary of allegations in support of their claim that "[r]ecognition of the privilege of separate

---

[16] *See* a true and correct copy of the *Windmill* Complaint attached hereto as Exhibit K
[17] *Id.* at 7

existence would promote injustice because the other Defendants in bad faith dominated and controlled [the Sensa Entities]…." The *Windmill* plaintiffs specifically allege:[18]

> The other Defendants directed day-to-day management of [the Sensa Entities].
>
> The other Defendants diverted assets from [the Sensa Entities] to themselves to the detriment of creditors, including Plaintiffs, and did so even while participating in the negotiation of a multi-million payment to the Federal Trade Commission described below.
>
> …
>
> Sensa [Products], IBI, IB Holding, JustFab and Brand Ideas have interlocking owners, directors, officers and employees.
>
> The offices of Sensa [Products], IBI, IB Holding, JustFab, and Brand Ideas all shared the same office building. When one met with any of the interlocking officers of the Defendants such as Goldenberg and Ressler, there was no attempt by Defendants to distinguish which entity they represented.
>
> Goldenberg admits that JustFab, IBI, Sensa [Products], and DermStore (another affiliated IB Holding entity) were all operated as a single entity with three different business lines that operated as [IBI] from at least 2006-2010…
>
> Goldenberg further admits that the transition to operating as separate entities did not occur overnight and that there was a period of time where expenses were shared.
>
> …
>
> Financial statements for years 2012 and 2013 show that JustFab and IB Holding[] prepared consolidated financials and filed a unitary tax return with [IBI] in 2012.

121.   The *Windmill* Complaint goes on to describe how Defendants used a series of intercompany transfers to move money between the supposedly separate entities, thereby hiding money from the Sensa Entities' creditors:[19]

---

[18] *Id.* at 7-8

From January 2010 through October 2014, during that time that JustFab, IBI, Sensa [Products], Dermstore and IB Holding[] had been "spun out," there were thousands of inter-defendant transfers and transactions between JustFab and the other defendants in this action … [*See* Ex. K at 103-258 (on information and belief a true and accurate spreadsheet of these transactions)].

These Intercompany Transfers were for the alleged purpose of "shared expenses," but these expenses were separated out and reconciled not by CFOs for each of the "separate entities," but were done solely by the CFO for Just Fab [sic] and Sensa [Products], Heidi Crane ("Crane")…

On September 11, 2013, the day that Sensa [Products] and Goldenberg signed the Consent Decree with the FTC, Crane admitted there was an Intercompany debt of some $22.4 Million outstanding from JustFab to "Corporate" for expenses such as IT licenses, insurance policies, JustFab's credit card debt (due to its inability to obtain credit cards), salaries for Goldenberg, Matt Fojut, Crane and other shared staff members.  [*See* Ex. K at 260 (on information and belief a true copy of a September 11, 2013 email chain from Crane)].

In or about May 2012, when IBI obtained approximately $20 million in loans from Bank of America, the loans were not intended to and did not support [IBI] but were merely obtained to provide working capital for JustFab with no intention of repayment to [IBI].  [*See* Ex. K at 263 (on information and belief, a true copy of an 11/25/13 internal document)].

Goldenberg concedes that there was $10,000,000 that IBI provided to IB Holding to purchase JustFab shares in or around 2011 and 2012 [] which was at or about the same time that [the Sensa Entities] and Goldenberg and others were negotiating the Consent Decree and fine with the FTC.

122.   The *Windmill* Complaint further highlighted specific abuses of the defendant entities by the individual Defendants.  Notably, Defendant Ressler used Defendant TCV and Brand Ideas (a bankrupt affiliate of the Sensa Entities) as a private bank account:[20]

Defendant Ressler utilized the Defendant entities: Brand Ideas and TCV as piggy banks for his personal expenses, admitting that on January 3,

---

[19] *Id.* at 8
[20] *Id.* at 10

2011 he "borrowed" some $500,000.00 from Brand Ideas and in or about 2012 borrowed some $3,000,000.00 from TCV to purchase his home.

123.   Furthermore, Defendants Chadwick, Ressler and Drew all participated in moving funds across the web of Defendant entities:[21]

> The funds to pay the fine the FTC imposed on IBI came from the sale of a purported "separate affiliated entity, Dermstore, where the proceeds from its sale to Target generated $100,000,000 that was divided up among other affiliated entities.  [*See* Ex. K at 266 (on information and belief a true and correct copy of an email from Chadwick to Drew and Ressler)].

124.   The *Windmill* Complaint advances a simple theory – because Defendants did not treat the Defendant entities as separate when they sought to perpetrate fraud, they cannot now be allowed to use a fiction of separate entities to protect their ill-gotten gains.

## THE *BANK OF AMERICA* ACTION

125.   In 2012, Bank of America ("BofA") extended a $15,000,000 line of credit to IBI.  When the Sensa Entities went bankrupt, Defendants defaulted.  BofA filed suit against the Sensa Entities, JustFab, IB Holding, Brand Ideas, Goldenberg and Ressler.[22]

126.   Specifically, BofA alleged that Defendants fraudulently cancelled millions of dollars in debt owed by JustFab to IBI.  Importantly, BofA alleged that (1) IBI, JustFab, and IB Holding engaged in a fraudulent transfer to hide money from BofA, (2) IBI, JustFab, IB Holding, Goldenberg and Ressler conspired to defraud BofA, and (3) JustFab and IB Holding are alter egos of IBI.  *See* Ex. L at 14-20.

---

[21] *Id*. at 9

[22] Attached hereto as Exhibit L is a true and correct copy of the BofA Second Amended Complaint.

127.   To support its allegations that JustFab and IB Holding should be held liable as the alter egos of IBI, BofA described interconnectedness of these Defendant entities:[23]

> In 2010, IB Holding[] was the parent company to JustFab and [IBI]. Defendants Goldenberg and Ressler were the co-CEOs of IB Holding[], JustFab, and [IBI].  These entities also had the same CFO, General Counsel, and many other employees.

> Prior to April 30, 2010, JustFab's predecessor entity was named Shoe Fabulous, LLC ("Show Fabulous").  At that time, Shoe Fabulous was a subsidiary of [IBI].  Show Fabulous also had the same CEO, CFO, General Counsel, and owners as [IBI].  Shoe Fabulous and [IBI] maintained intercompany accounts between them.  There was no written agreement setting forth the terms of how the intercompany accounts were to operate or how the amounts were to be repaid.  The accounts were not settled every month.  Rather, the practice was that the CFO and the CEO of the two entities jointly determined, on an as needed basis, if and when the accounts would be settled and/or repaid.

> In late 2009 or 2010, Shoe Fabulous started incurring expenses to pay vendors, employees, rent, and other costs.  To cover theses expenses, as well as the initial capital needed to fund Show Fabulous' business, [IBI] paid these expenses directly and/or transferred cash to Shoe Fabulous. Defendants have testified that these expenses and/or transfers of cash were decisions made on behalf of "all entities" and "the enterprise as a whole."  Goldenberg testified that "So to fund JustFab, Inc., when we were starting that business you know we would use profits from [IBI] and the Dermstore business, to help fund that operation."

> These expenses and/or cash payments eventually totaled over $22,000,000.  There was no agreement between Shoe Fabulous and [IBI] as to when the balance was to be repaid.  [IBI] did not receive any equity or other interest in Shoe Fabulous in exchange for transferring $22,000,000 to Shoe Fabulous.

> Shoe Fabulous was ultimately renamed as JustFab.

128.   The *BofA* Complaint went on to detail how Goldenberg and Ressler abused their control over IBI to release JustFab of these substantial debts in exchange for no consideration:[24]

---

[23] *Id.* at 18-19

On or about September 13, 2011, JustFab raised outside capital from investors.  As part of that transaction, Defendants contend that an agreement was reached between JustFab and its new investors that JustFab could not repay any amount owed to [IBI] less than a "floor" of $18,700,000, unless and until one of the entities entered into a qualifying capital transaction and raised at least $1000,000,0000.

Defendants also contend that the September 13, 2011 intercompany Agreement between JustFab, IB Holding[], and [IBI] likewise provided that JustFab was not required to pay any amounts to [IBI] less than a "floor" of $18,700,000, unless and until one of the entities entered into a qualifying capital transaction and raised at least $100,00,000 [sic].  This agreement was signed by Goldenberg on behalf of all tree entities, in his position as CEO of all three entities.

Defendants contend that these agreements "changed the nature of that receivable."  Goldenberg testified that "Up until this point that receivable could be paid back.  We had all the same owners.  There was no contractual restriction."

…

If [IBI] were truly an independent entity and not controlled by the same owners and employees of JustFab, then [IBI] never would have agreed to forego the right to collect the $18,700,000 that it had transferred to JustFab.

As a result of these actions, [IBI], IB Holding[], and JustFab were actually operating as a single enterprise, without observing corporate formalities of separate, independent entities that had separate and independent financial accounts.  Rather, these entities were acting for the benefit of their common owners.

129.   Defendants Ressler and Goldenberg, as co-CEOs and co-owners of JustFab, personally benefited from their decision as IBI officers to cancel the debt JustFab owed to IBI:[25]

Each of the Defendants collectively determined that they would contend that the receivables were not currently due and owing and were not collectable by [IBI]. Goldenberg and Ressler are owners, directors, and officers of Defendants and they directed Defendants to take this position, and/or acquiesced to such a position once it was taken.  In particular,

---

[24]*Id*. at 19-20
[25]*Id*. at 17

[BofA] believes that each of said Defendants obtained a monetary benefit resulting from these actions by enhancing the value of Just Fab [sic] and IB Holding at the expense of [IBI] and [BofA], and that Goldenberg and Ressler did so to increase their own interest in JustFab.

130.   In overruling defendants demurrer against these pleadings, Judge Dierdre Hill found that BofA's "pleading adequately describes an alleged conspiratorial scheme to defraud Plaintiff of its right to repayment under a substantial commercial loan." Defendants cannot use self-dealing intercompany loans to escape the Sensa Entities' liability to its creditors – regardless of whether those creditors are lenders or defrauded consumers.

### ALTER EGO / VIEL PIERCING ALLEGATIONS

131.   Plaintiff hereby incorporates the factual allegations of the *FTC* Complaint, the *Hirsch* Complaint, the *BofA* Complaint and the *Windmill* complaint (collectively the "Complaints"). Without limiting this incorporation, Plaintiff specifically incorporates the facts in the Complaints that describe the lack of corporate formalities among the Defendants, the domination of the Sensa Entities by the other Defendants and the active de-capitalization of the Sensa Entities by the Defendants.

132.   Defendants Goldenberg and Ressler, as owners, directors and officers of IBI, caused IBI to forego its right to collect nearly $20 million from JustFab. This was not a decision that a rational profit-maximizing entity would make; the agreement solely benefited IB Holding and JustFab. IBI received no consideration for this purported release of debts. Rather, this release was an active de-capitalization of the IBI by its owners and officers to insulate the ill-gotten gains of the Sensa fraud.

133.   Defendant Goldenberg, acting as CEO for all three entities, signed the agreement to forego JustFab's debt to IBI. Defendant Goldenberg acted with the approval and support of his co-CEO, co-founder and co-owner, Ressler. In doing this, Goldenberg and Ressler dominated IBI to not act in the entity's self-interest, but to rather act in the interest of JustFab's owners – namely, themselves. It was against

the self-interest of IBI to release the JustFab debt.  This deal only benefited IB Holding, JustFab, and their owners.  Through IB Holding, the then owner of IBI and JustFab, Defendants Ressler and Goldenberg had an ownership interest in both IBI and Justfab.  To them, the debt release was merely a transfer of money from their left pocket to their right.

134.   As a result of these actions, the Sensa Entities, IB Holding, and JustFab were actually operating as a single enterprise, without observing corporate formalities of separate, independent entities that had separate financial accounts.  Instead of operating for their own self-interest, these entities were acting for the benefit of their common owners.

135.   Without limiting the earlier incorporation of the Complaints, Plaintiff further relies on the additional following allegations describing the treatment of the **JustFab**, **IB Holding** and the **Sensa Entities** as a single enterprise such that the entities operated as alter egos of each other:

a.   Officers and directors of these individual entities made no effort to distinguish which entity they represented when they worked with third parties.  For much of the relevant time period, these Defendant entities operated from the same address – at 2301 Rosecrans Avenue, El Segundo, California.

b.   Sensa Products, IBI, IB Holding, and JustFab have interlocking owners, directors, officers and employees.

c.   JustFab, IBI, and Dermstore (another affiliated IB Holding entity) were all operated as a single entity with three different business lines that operated as IBI from at least 2006 unitl 2010.

d.   Separation of these entities did not occur definitively.  There was a substantial period of time where money moved freely between the entities.

e.   These defendant entities did not engage in arm's length negotiations.  For instance, intercompany loans between IBI, Sensa Products, IB Holding and JustFab generally had no formal agreements, bargained for consideration, or loan payment schedule.

f.  IBI released JustFab of nearly $20,000,000 in debt for no consideration. This was not a decision that a rational profit-maximizing entity would make; the agreement solely benefited IB Holding, JustFab and their owners.

g.  IBI provided $10,000,000 to IB Holding to purchase JustFab shares. *See* Ex. K at 9.

h.  Financial statements for years 2012 and 2013 show that JustFab and IB Holding prepared consolidated financials and filed a unitary tax return with IBI in 2012.

136.   For the foregoing reasons, adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from **JustFab** and **IB Holding** would permit abuse of the corporate privilege and sanction fraud to the detriment of consumers harmed by the Sensa fraud.  Indeed, the Sensa Entities and are insolvent, out of business, and have assigned their assets to an assignee.  They have no financial reason to even appear in this lawsuit - but are doing so only because they are owned and controlled by the owners of JustFab and seek to assist JustFab in attempting to prevent Plaintiff and the class she seeks to represent from seeking recovery for the Sensa fraud.  Accordingly, the Court should determine that Defendant entities are jointly and severally liable for the Sensa fraud.

137.   Plaintiff specifically alleges that Defendant **Goldenberg** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for his personal financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendant **Goldenberg** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **Goldenberg** jointly and severally liable for the Sensa Entities conduct:

a. Defendant Goldenberg, either directly or indirectly, was an owner of IBI and Sensa Products.

b. Defendant Goldenberg, either indirectly or directly, is an owner of IB Holding and JustFab.

c. Defendant Goldenberg did not treat these companies as separate and distinct entities.  He made no effort to distinguish which entity he represented when he worked with third parties.  For much of the relevant time period, Defendant Goldenberg operated the Defendant entities from the same address – at 2301 Rosecrans Avenue, El Segundo, California.

d. Under Defendant Goldenberg's control, these Defendant entities did not engage in arm's length negotiations.  For instance, intercompany loans between IBI, Sensa Products, IB Holding[] and JustFab generally had no formal agreements, bargained for consideration, or loan payment schedule.

e. Defendant Goldenberg, acting as the CEO, owner and board member of the Sensa Entities, actively de-capitalized the Sensa Entities to protect the ill-gotten gains of the Sensa fraud.  Plaintiff is aware of three distinct examples of this active de-capitalization.

f. First, Defendant Goldenberg personally authorized Sensa Products to advance Defendant Hirsch millions of dollars; these advancements continued after Sensa Products was insolvent and after Sensa Products was faced with massive FTC fines.

g. Second, Defendant Goldenberg, acting as IBI's CEO, released nearly $20,000,000 of JustFab's debt – an entity he owned in part.

h. Third, Goldenberg concedes that IBI provided $10,000,000 to IB Holding, a company he owned in part, to purchase JustFab shares.  *See* Ex. K at 9.

i. On the basis of this pattern, Plaintiff alleges that Defendant Goldenberg engaged in other actions to de-capitalize the Sensa Entities to protect the ill-gotten gains of the Sensa fraud from creditors, including but not limited to, advances and distributions of money to himself personally.

138.   Plaintiff specifically alleges that Defendant **Ressler** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for his personal financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendant **Ressler** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **Ressler** jointly and severally liable for the Sensa Entities conduct:

a.  Defendant Ressler, either directly or indirectly, is an owner of IB Holding[] and JustFab.

b.  Defendant Ressler, either directly or indirectly, was an owner of Sensa Products and IBI.

c.  Defendant Ressler did not treat the companies as separate and distinct entities.  He made no effort to distinguish which entity he represented when he worked with third parties.  For much of the relevant time period, Defendant Ressler operated the Defendant entities from the same address – at 2301 Rosecrans Avenue, El Segundo, California.

d.  Under Defendant Ressler's control, these Defendant entities never engaged in arm's length negotiations.  For instance, intercompany loans between IBI, Sensa Products, IB Holding[] and JustFab had no formal agreements, bargained for consideration, or loan payment schedule.

e.  Defendant Ressler utilized the Defendant entity TCV and the now bankrupt Brand Ideas, an affiliate of IB Holding, as piggy banks for his personal expenses.  He admits that on January 3, 2011 he "borrowed" some $500,000.00 from Brand Ideas and in or about 2012 he borrowed some $3,000,000.00 from TCV to purchase his home.

f.  Defendant Ressler, acting as the CEO, owner and board member of the Sensa Entities, actively de-capitalized the Sensa Entities to protect the ill-gotten gains of the Sensa fraud.  Plaintiff is aware of three distinct examples of this active de-capitalization.

g.  First, Defendant Ressler, in forming Sensa Products, authorized Sensa Products to advance Defendant Hirsch millions of dollars; these

advancements continued after Sensa Products was insolvent and after Sensa Products was faced with massive FTC fines.

h. Second, Defendant Ressler, as a co-CEO, co-owner and co-founder of the Sensa Entities, ratified Defendant Goldenberg's release of around $20,000,000 in receivables from JustFab – an entity Defendant Ressler owned in part.

i. Third, IBI provided $10,000,000 to IB Holding, a company Ressler owned in part, to purchase JustFab shares.  See Ex. K at 9.

j. On the basis of this pattern, Plaintiff alleges that Defendant Ressler engaged in other actions to de-capitalize the Sensa Entities to protect the ill-gotten gains of the Sensa fraud from creditors, including but not limited to, advances and distributions of money to himself personally.

139.   Plaintiff specifically alleges that Defendant **Hirsch** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for his personal financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendant **Hirsch** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **Hirsch** jointly and severally liable for the Sensa Entities conduct:

a. Defendant Hirsch was a 10% owner of Defendant Sensa Products.

b. In 2010, Defendants Hirsch, Goldenberg and Ressler organized the formation of Sensa Products and the compensation structure of Dr. Hirsch.  In 2012, Defendant Goldenberg and Dr. Hirsch agreed to the 5th Amendment to the Sensa Products LLC Agreement that authorized millions of dollars in advancements to Dr. Hirsch.

c. Of the $37,000,000 Sensa Products claimed as yearly profit between June 2008 and October 2014, almost $11,000,000 was distributed and advanced to Dr. Hirsch.

d. As creditor and consumer liabilities loomed, Defendants continued to bail money from Sensa Products into the pockets of Defendant Hirsch to hide the ill-gotten gains of the Sensa fraud.

e. Indeed, Sensa Products admits that it was insolvent no later than October 17, 2013, but the company nevertheless continued to pay Defendant Hirsch at least $1,133,567.64 after this date.

f. A rational profit maximizing entity would not continue to advance millions of dollars in the face of insolvency.  Dr. Hirsch dominated Sensa Products to act irrationally.  In doing so, Dr. Hirsch treated Sensa Products like a personal bank account and abused the corporate form to frustrate the creditors of Sensa Products.

140.   Plaintiff specifically alleges that Defendant **Chadwick** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for her personal financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendant **Chadwick** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **Chadwick** jointly and severally liable for the Sensa Entities conduct:

a. As VP of marketing and President of the Sensa Entities Defendant Chadwick controlled the day-to-day activities of the Sensa fraud.

b. As President of the Sensa Entities Defendant Chadwick participated in, ratified and/or endorsed Defendant Goldenberg's release of around $20,000,000 in JustFab receivables, despite no consideration or benefit to the Sensa Entities.

c. Defendant Chadwick shared her office at 2301 Rosecrans Avenue, El Segundo, California with Sensa Products, IBI, IB Holding, Just Fab, Brand Ideas, Goldenberg, and Ressler.

d. Defendant Chadwick was instrumental in controlling the flow of capital across the web of Defendant entities.

e. From April 2011 until September 11, 2013, Defendant Chadwick discussed the potential implication of an FTC fine ranging from $65,000,000 to $45,000,000 with Ressler Goldenberg and Defendant Entities.

    f.   As President of the Sensa Entities, Defendant Chadwick was aware that the Sensa Entities faced insolvency no later than October 17, 2013.

    g.   Despite her knowledge of the Sensa Entities' financial insolvency and looming FTC liability, Defendant Chadwick continued the Sensa fraud to further her own pecuniary interest.

    h.   Defendant Chadwick instructed Ressler and the Sensa Entities Board to not disclose the true financial state of the Sensa Entities' to creditors.

    i.   Defendant Chadwick was a shareholder of the Sensa Entities.

    j.   Plaintiff alleges that, based on Dr. Hirsch's compensation structure, as well as the other de-capitalization schemes, Defendant Chadwick's was compensated through advancements that de-capitalized the Sensa Entities and hid the ill-gotten gains of the Sensa fraud.

141.   Plaintiff specifically alleges that Defendant **Drew** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for his personal financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendant **Drew** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **Drew** jointly and severally liable for the Sensa Entities conduct:

    a.   Defendant John Drew is a general partner of TCV and Ventures. John Drew was responsible for managing TCV and Ventures' investment in Sensa Products and IBI where he served on the board of directors of both Sensa Products and IBI.  Defendant Drew is a principal of IB Holding.

    b.   Defendant Drew participated in controlling the flow of capital across the web of Defendant entities.

    c.   As a board member of the Sensa Entities, Defendant Drew participated in, ratified and/or endorsed Defendant Goldenberg's release of around $20,000,000 in JustFab receivables, despite no consideration or benefit to the Sensa Entities.

    d.   Defendant Drew is a principal of IB Holding.  IB Holding is the owner and JustFab.  Defendant Drew, as a principal of IB Holding, had/has an ownership interest in both IBI and Justfab.  Release of the JustFab debt benefited Defendant Drew to the detriment of the Sensa Entities.

e. On the basis of this pattern of de-capitalization, Plaintiff alleges that Defendant Drew engaged in other actions to de-capitalize the Sensa Entities to protect the ill-gotten gains of the Sensa fraud from creditors, including but not limited to, advances and distributions of money to himself personally.

142.   Plaintiff specifically alleges that Defendants **TCV** and **Ventures** had an ownership interest in the Sensa Entities and dominated the Sensa Entities for their financial gain by perpetrating the Sensa fraud and protecting the ill-gotten gains through an abuse of the corporate structure.  Adherence to the fiction of the separate existence of the Sensa Entities as a distinct entity from Defendants **TCV** and **Ventures** would permit abuse of the corporate privilege and sanction fraud, to the detriment of injured consumers.  Without limiting the earlier incorporation of the Complaints, Plaintiff relies on the following to hold Defendant **TCV** and **Ventures** jointly and severally liable for the Sensa Entities conduct:

a. TCV and Ventures, either directly or indirectly, were owners of the Sensa Entities.

b. TCV and Venture, either directly or indirectly, are owners IB Holding and JustFab.

c. These Defendants appointed John Drew to serve on the board of directors of both Sensa Products and IBI.  These organizations appointed John Drew to serve as a principal for IB Holding.

d. Defendants' agent Drew participated in controlling the flow of capital across the web of Defendant Entities.

e. As owners of the Sensa Entities, IB Holding and JustFab, Defendants' TCV and Ventures ratified and/or endorsed Defendant Goldenberg's release of around $20,000,000 in JustFab receivables, despite no consideration or benefit to the Sensa Entities.

143.   Defendants IB Holding, JustFab, Alan R. Hirsch, Don Ressler, Adam Goldenberg, Kristen Chadwick, TCV, Ventures, John Drew, and Does 1-10. are liable for the conduct of the Sensa Entities under a theory of alter ego / veil piercing because these Defendants used the corporate form of the Sensa Entities to accomplish

fraudulent objectives, namely to fraudulently promote the sale of Sensa and to conceal the proceeds of that fraud and frustrate the ability of victims to obtain redress for the fraud.  The other Defendants used the Sensa Entities' corporate form to conceal the profits and income derived from the Sensa fraud.   Plaintiff requests that this Court hold the other Defendants jointly and severally liable for the Sensa Entities' conduct.

## CLASS ACTION ALLEGATIONS

144.   Plaintiff Stokes seeks to represent a class defined as all persons in the United States who purchased Sensa crystals at any time from August 22, 2012 to the present (the "National Class").  Excluded from the Class are governmental entities, Defendants, Defendants' affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased Sensa crystals for resale. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

145.   Plaintiff Stokes also seeks to represent a subclass defined as all members of the Class who purchased Sensa crystals from within the state of Florida (the "Florida Subclass") at any time from August 22, 2012 to the present.

146.   Members of the Class and the Florida subclass are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery of Defendants' records.  Class members may be notified of the pendency of this action by mail, email, and/or publication.

147.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

        a.      Whether the marketing and advertisements for Sensa included false, misleading and unsubstantiated statements;

b.  Whether Defendants' conduct violated the Magnuson-Moss Warranty Act;

c.  Whether Defendants' conduct violated the CLRA;

d.  Whether Defendants' conduct violated the FAL;

e.  Whether Defendants' conduct violated the UCL's unlawful, unfair, and fraudulent and deceptive prongs;

f.  Whether Defendants' conduct violated Florida's Deceptive and Unfair Trade Practices Act;

g.  Whether Defendants' conduct breached express or implied warranties; and

h.  Whether Defendants made negligent misrepresentations.

148.   Plaintiff Stokes' claims are typical of the claims of the proposed Class and the Florida Subclass.  Each Class member was subjected to the same illegal conduct, was harmed in the same way, and has claims for relief under the same legal theories.

149.   Plaintiff Stokes is an adequate representatives of the Class and the Florida Subclass because her interests do not conflict with the interests of the Class and Subclass members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class and Subclass members will be fairly and adequately protected by Plaintiff and her counsel.

150.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of a defendant's

liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

151.   Unless a class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiff and proposed Class members. Unless a class-wide injunction is issued, Defendants will continue to commit the violations of law alleged, and the members of the Class and the general public will continue to be harmed thereby.

## COUNT I

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.***

152.   Plaintiff incorporates by reference and re-allege each and every allegation set forth above as though fully set forth herein.

153.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

154.   The Sensa Weight Loss System is a consumer product within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

155.   Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

156.   The Sensa Entities are both "suppliers" and a "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4) and (5).

157.   The Sensa Entities' statements as alleged herein (including, *inter alia*, statements that Sensa is a "new, clinically proven method of losing weight," "backed up by scientific proof," with "more than 2 decades of research," and "exclusive tastant technology [] proven in clinical testing to produce an average weight loss of 30.5 pounds in just 6 months") are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

158.   As alleged herein, the Sensa Entities have breached this written warranty by selling consumers the Sensa Weight Loss System, which is not in fact "clinically

proven," "backed up by scientific proof," supported by "more than 2 decades of research," or "proven in clinical testing to produce an average weight loss of 30.5 pounds in just 6 months" as warranted, thus failing to conform to the written warranty, violating the Magnuson-Moss Warranty Act, and causing Plaintiff and the Class injury and damage.

159. As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301.

## COUNT II

### Breach of Express Warranty

160. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

161. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

162. Plaintiff, and each member of the Class, formed a contract with the Sensa Entities at the time Plaintiff and the other members of the Class purchased Sensa. The terms of that contract include the promises and affirmations of fact made by the Sensa Entities in advertisements and the packaging of Sensa as described above. This product packaging and advertising constitutes express warranties, became part of the basis of the bargain, and is part of a standardized contract between Plaintiff and the members of the Class on the one hand, and the Sensa Entities on the other.

163. All conditions precedent to the Sensa Entities' liability under this contract have been performed by Plaintiff and the Class. The Sensa Entities breached the terms of this contract, including the express warranties, with Plaintiff and the Class

by not providing a product that was scientifically proven to provide the promised weight-loss benefits.

164.   As a result of the Sensa Entities' breach of warranty, Plaintiff and the Class have been damaged in the amount according to proof.

165.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' breach of express warranty.

## COUNT III

## Breach of Implied Warranties

166.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

167.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

168.   The Sensa Entities knew that Plaintiff and other Class members were buying Sensa for a particular purpose – to lose weight – and that Plaintiff and other Class members relied on the Sensa Entities' skill and judgment to select goods fit for that purpose.

169.   Sensa is not fit for this purpose because it does not produce the results that it promises, despite the promises that the Sensa Entities made on their advertising, labeling, and packaging.  For the same reasons, Sensa was unmerchantable at the time it left the location where it was created, and remains unmerchantable at all times after that.  This unmerchantability is inherent in the product.

170.   Plaintiff notified the Sensa Entities of the acts constituting breach of the implied warranties of fitness for a particular purpose and merchantability, both for herself and the Class.  Plaintiff and other Class members suffered injury as a result of

these breaches of warranty, for which Plaintiff hereby prays, because she paid for and received Sensa that was not as warranted.

171.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' breach of implied warranty

## COUNT IV

### Violation of California's Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*

172.   Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

173.   Plaintiff Stokes brings this claim individually and on behalf of the members of the proposed Class against Defendants.

174.   The Sensa Entities violated Civil Code § 1770(a)(2), (5), (7), (9), and (14) by making false, and misleading statements regarding Sensa crystals.

175.   Plaintiff Stokes and the members of the Class have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for Sensa crystals that they otherwise would not have incurred or paid.

176.   On February 23, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants Sensa Products, IBI, Hirsch, and GNC which complies in all respects with California Civil Code §1782(a).  Plaintiff's counsel sent Defendants a letter via certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.

177.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the CLRA.

178.   Pursuant to Civil Code § 1780, Plaintiff seeks an order of this Court permanently enjoining Defendants from continuing to engage in their unlawful conduct as alleged herein.  Plaintiff also seeks an order of this Court requiring Defendants to:

      a.     Pay damages according to proof;

      b.     Immediately cease the conduct alleged herein;

      c.     Make full restitution of all monies wrongfully obtained;

      d.     Disgorge all ill-gotten revenues and/or profits; and

      e.     Pay punitive damages.

## COUNT V

**Violation of California's False Advertising Law ("FAL"),
Business & Professions Code § 17500 *et seq*.**

179.   Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

180.   Plaintiff Stokes brings this claim individually and on behalf of the members of the Class against Defendants.

181.   Defendants violated Business & Professions Code § 17500 by publicly disseminating false, misleading and unsubstantiated advertisements regarding Sensa crystals.

182.   The Sensa Entities false, and misleading advertisements were disseminated to increase the sales of Sensa.

183.   The Sensa Entities knew or should have known that their advertisements for Sensa crystals were false, misleading, and unsubstantiated, and those advertisements would induce consumers to purchase Sensa crystals.

184.   Furthermore, the Sensa Entities publicly disseminated the false, and misleading advertisements as part of a plan or scheme with the intent to sell an unproven, ineffective, and worthless product.

185.   Plaintiff Stokes and the members of the Class have suffered harm as a result of these violations of the FAL because they have incurred charges and/or paid monies for Sensa crystals that they otherwise would not have incurred or paid.

186.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the FAL.

187.   Pursuant to Bus. & Prof. Code § 17500, Plaintiff Stokes seeks an order of this Court permanently enjoining Defendants from continuing to publicly disseminate false, misleading, or unsubstantiated advertisements for Sensa crystals as alleged herein.  Plaintiff Stokes also seeks an order requiring Defendants to:

      a.   make full restitution for all monies wrongfully obtained; and

      b.   disgorge all ill-gotten revenues and/or profits.

## COUNT VI

**Unlawful Business Practices In Violation of California's Unfair Competition Law ("UCL"),**
**Business & Professions Code §§ 17200 *et seq*.**
**(Unlawful Practices)**

188.   Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

189.   Plaintiff Stokes brings this claim individually and on behalf of the members of the Class against Defendants.

190.   Defendants violated the unlawful prong of the UCL by violating Civil Code § 1770(a)(2), (5), (7), (9), and (14) and Business & Professions Code § 17500 as described above.

191.   The Sensa Entities also violated the unlawful prong of the UCL by violating the FTC Act, 15 U.S.C. § 45(n) because false, misleading, and unsubstantiated claims concerning the clinically proven efficacy of Sensa crystals are likely to deceive reasonable consumers and are likely to cause injury to consumers by enticing them to purchase a worthless and ineffective product.  These claims are also

1    likely to incur charges and/or pay monies for Sensa crystals that they otherwise

2    would not have incurred or paid.  These injuries are substantial, and are not

3    reasonably avoidable by consumers who in most cases would be unable to debunk the

4    Sensa Entities' bogus claims about the purported efficacy of Sensa crystals.

5    Furthermore, "[t]he FTC typically requires claims about the efficacy or safety of

6    dietary supplements to be supported with 'competent and reliable scientific

7    evidence,' defined in FTC cases as 'tests, analyses, research, studies, or other

8    evidence based on the expertise of professionals in the relevant area, that have been

9    conducted and evaluated in an objective manner by persons qualified to do so, using

10   procedures generally accepted in the profession to yield accurate and reliable

11   results.'"[26]  Such support was lacking here, thus the Sensa Entities claims concerning

12   the efficacy of Sensa crystals were unsupported and deceptive in violation of the FTC

13   Act.

14        192.   Plaintiff Stokes and the members of the Class have suffered harm as a

15   result of these violations of the unlawful prong of the UCL because they have

16   incurred charges and/or paid monies for Sensa they otherwise would not have

17   incurred or paid.

18        193.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler,

19   Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities,

20   are jointly and severally liable for the Sensa Entities' violation of the UCL.

21        194.   Pursuant to Business & Professions Code § 17203, Plaintiff Stokes seeks

22   an order of this Court permanently enjoining Defendants from continuing to engage

23   in their unlawful conduct as alleged herein.  Plaintiff Stokes also seeks an order

24   requiring Defendants to:

25

26   _____

27   [26] Federal Trade Commission, *Dietary Supplements: An Adverting Guide for
     Industry*, p. 9, *available at* http://business.ftc.gov/sites/default/files/pdf/bus09-

28   dietary-supplements-advertising-guide-industry.pdf  ("FTC Advertising Guide").

a.   immediately cease the conduct described herein;

b.   make full restitution of all monies wrongfully obtained; and

c.   disgorge all ill-gotten revenues and/or profits.

## COUNT VII

**Unlawful Business Practices In Violation Of California's Unfair Competition Law ("UCL"),
Business & Professions Code §§ 17200 *et seq*.
(Unfair Practices)**

195.   Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

196.   Plaintiff Stokes brings this claim individually and on behalf of the members of the proposed Class against Defendants.

197.   The Sensa Entities' conduct, described herein, violated the unfair prong of the UCL because such conduct violated various laws and policies recognized by the California Legislature and the California courts, including without limitation, the CLRA and FAL, because the utility of the Sensa Entities conduct is significantly outweighed by the gravity of the harms it imposed on consumers, and because Defendants' business practices described herein are oppressive, unscrupulous or substantially injurious to consumers.

198.   Plaintiff Stokes and the members of the Class have suffered harm as a result of these violations of the unfair prong of the UCL because they have incurred charges and/or paid monies for Sensa they otherwise would not have incurred or paid.

199.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the UCL.

200.   Pursuant to Business & Professions Code § 17203, Plaintiff Stokes seeks an order of this Court permanently enjoining Defendants from continuing to engage

in their unfair and unlawful conduct as alleged herein.  Plaintiff Stokes also seeks an order requiring Defendants to:

      a.    immediately cease their unfair and unlawful acts and practices;

      b.    make full restitution of all monies wrongfully obtained; and

      c.    disgorge all ill-gotten revenues and/or profits.

**COUNT VIII**

**Unlawful Business Practices In Violation of California's Unfair Competition Law ("UCL"),**
**Business & Professions Code §§ 17200 *et seq*.**
**(Fraudulent and Deceptive Practices)**

201.  Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

202.  Plaintiff Stokes brings this claim individually and on behalf of the members of the Class against Defendants.

203.  The Sensa Entities violated the fraudulent and deceptive prong of the UCL by disseminating false, misleading and unsubstantiated advertisements and marketing materials regarding the effectiveness of Sensa.

204.  Plaintiff Stokes and the members of the Class have suffered harm as a result of these violations of the fraudulent and deceptive prong of the UCL because they have incurred charges and/or paid monies for Sensa they otherwise would not have incurred or paid.

205.  As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the UCL.

206.  Pursuant to Business & Professions Code § 17203, Plaintiff Stokes seeks an order permanently enjoining Defendants from continuing to engage in their fraudulent and deceptive conduct alleged herein.  Plaintiff Stokes also seeks an order requiring Defendants to:

a.  immediately cease their fraudulent and deceptive acts and practices;

b.  make full restitution of all monies wrongfully obtained; and

c.  disgorge all ill-gotten revenues and/or profits.

## COUNT IX

### Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*

207.  Plaintiff Stokes incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

208.  Plaintiff Stokes brings this claim individually and on behalf of the members of the proposed Florida Subclass against Defendants.

209.  The Sensa Entities' false advertising of Sensa directly affected Plaintiff Stokes and other consumers in Florida.

210.  The FDUTPA is intended to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.201(2).

211.  Plaintiff is a consumer as defined by FDUTPA, Fla. Stat. § 501.203. The Sensa products are goods within the meaning of FDUTPA.

212.  The Sensa Entities' conduct, described herein, constitutes unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce defined in Fla. Stat. § 501.201 *et seq.* because the Sensa Entities made false and misleading statements to promote Sensa, and had no intention of selling Sensa as advertised.

213.  The Sensa Entities engaged in a continuing course of conduct of unfair competition because the Sensa Entities' marketing and selling of Sensa was likely to deceive the public, including Plaintiff Stokes and members of the Florida Subclass. The Sensa Entities have made unfair, deceptive, untrue, or misleading statements in

advertising media, including the Internet, within the meaning of FDUTPA, § 501.201, *et seq.*

214.   Further, in advertising and packing the Sensa products, the Sensa Entities do not have the requisite competent and reliable evidence to support the claims about the products made in Sensa Entities' advertising.  Therefore, the Sensa Entities made false and misleading statements concerning Sensa, and refused to reveal true facts.

215.   The Sensa Entities' practices also constitute unfair methods of competition as described in Fla. Stat. § 501.203 because Sensa does not perform as warranted.

216.   As a direct and proximate result of the Sensa Entities' violations of FDUTPA, Plaintiff Stokes and the Florida Subclass have suffered economic loss. Plaintiff Stokes and the Florida Subclass would not have purchased Sensa had they known that it was not as the Sensa Entities represented it.

217.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' violation of the FAL

218.   Pursuant to FDUTPA, Plaintiff Stokes, seeks an order permanently enjoining Defendants from continuing to engage in their fraudulent and deceptive conduct alleged herein.  Plaintiff Stokes also seeks an order requiring Defendants to:

a.   immediately cease their fraudulent and deceptive acts and practices;

b.   make full restitution of all monies wrongfully obtained; and

c.   disgorge all ill-gotten revenues and/or profits.

## COUNT X
### Negligent Misrepresentation

219.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

220.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

221.   To make a claim for negligent misrepresentation, Plaintiff must show the following:

      a.    The Sensa Entities made representations in the course of their business;

      b.    the Sensa Entities supplied "false information" for the guidance of others in their business;

      c.    the Sensa Entities did not exercise reasonable care or competence in obtaining or communicating the information; and

      d.    Plaintiff suffered pecuniary loss by justification relying on the misrepresentation.

222.   All these factors exist here.  The Sensa Entities advertised and made false, misleading, and deceptive claims about Sensa.  Namely, the Sensa Entities claimed that Sensa tastants are sprinkled onto food and the tastants "trigger your 'I feel full' signal, so you eat less and feel more satisfied." The Sensa Entities claim that Sensa will allow a consumer to "Lose 30 Pounds Without Dieting" by "[e]at[ing] your favorite foods," with "no restrictive dieting," "no calorie counting," and "no sacrifice."

223.   The Sensa Entities' representations were not true, and the Sensa Entities did not exercise reasonable care or competence in obtaining or communicating this information.  In fact, the Sensa Entities' claims in connection with Sensa are inconsistent with and/or conflict with the guidelines and/or statements of the FDA which, in an effort to promote real weight loss and to prevent Americans from being defrauded by "miracle pills," instructs that "[t]he only proven way to lose weight is either to reduce the number of calories you eat or to increase the number of calories you burn off through exercise."

224.   Plaintiff and the Class relied on the Sensa Entities representations of a guaranteed weight loss without dieting or exercise upon purchasing Sensa.  There would be no other reason to purchase a weight-loss product other than for weight-loss.  As a result, Plaintiff and the Class were damaged by their purchase of Sensa.

225.   As set forth above, Defendants JustFab, IB Holding, Hirsch, Ressler, Goldenberg, Chadwick, TCV, Ventures and Drew, as alter egos of the Sensa Entities, are jointly and severally liable for the Sensa Entities' negligent misrepresentation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.   An order certifying that this lawsuit is properly maintainable as a class action and certifying Plaintiff Stokes as the representatives of the Class and the Florida Subclass;

B.   For all forms of relief set forth above;

C.   Damages against Defendants in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law on any amounts awarded;

D.   Restitution and/or disgorgement in an amount to be determined at trial;

E.   Punitive damages;

F.   An order enjoining Defendants from continuing to engage in the unlawful conduct and practices described herein;

G.   Reasonable attorneys' fees and costs;

H.   An order disregarding the corporate entity of the Sensa Entities and imposing the Sensa Entities' liabilities on the other Defendants; and

I.   Granting such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 1, 2016

**BURSOR & FISHER, P.A.**

By:   *s/ L. Timothy Fisher*

Scott A. Bursor (State Bar No. 276006)
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: scott@bursor.com
            ltfisher@bursor.com
            apersinger@bursor.com

*Interim Class Counsel*

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (#134180)
Mark S. Greenstone (#199606)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**GLANCY BINKOW & GOLDBERG LLP**
Brian P. Murray
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: bmurray@glancylaw.com

**CHEFFY PASSIDOMO**
Louis D. D'Agostino
821 Fifth Avenue South
Naples, FL 34102
Telephone: (239) 261-9300
Facsimile: (239) 435-1218

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COLEMAN, YOVANOVICH & KOESTER, P.A.**
Edmond E. Koester
4001 Tamiami Trail N., Suite 300
Naples, FL 34103
Telephone: (239) 435-3535
Facsimile: (239) 435-1218

*Attorneys for Plaintiff Stokes*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


Debbie Schroeder